T.C. Memo. 2016-67

UNITED STATES TAX COURT

MARK ANDRES GREEN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4715-12.                          Filed April 14, 2016.

Mark Andres Green, pro se.

<u>Dessa J. Baker-Inman</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  In two notices of deficiency dated November 18, 2011, respondent determined Federal income tax deficiencies, additions to tax, and a civil fraud penalty, as follows:

**[*2]**

| | | Additions to tax | | | Civil fraud penalty |
| Year | Deficiency | Sec. 6651(a)(2)[1] | Sec. 6651(f) | Sec. 6654(a) | sec. 6663 |
|---|---|---|---|---|---|
| 2001 | $43,790 | $10,947.50 | $31,747.75 | $985.63 | --- |
| 2002 | 4,039 | --- | --- | --- | $3,029.25 |
| 2003 | 12,149 | 1,619.75 | 4,697.27 | 150.93 | --- |
| 2004 | 3,342 | 621.00 | 1,800.90 | --- | --- |

[1]The amounts of any additions to tax under sec. 6651(a)(2) will be determined pursuant to sec. 6651(a)(2), (b), and (c).

After concessions,[1] the issues for decision are whether: (1) petitioner failed to report income for 2001, 2003, and 2004; (2) petitioner is entitled to a deduction under sections 861 and 1341[2] for 2002; (3) petitioner is liable for additions to tax under section 6651(f) for fraudulent failure to file for 2001, 2003, and 2004; (4) petitioner is liable for a civil fraud penalty under section 6663 for 2002; (5) petitioner is liable for additions to tax under section 6651(a)(2) for failure to pay for 2001, 2003, and 2004; (6) petitioner is liable for an addition to tax under section 6654 for failure to make estimated tax payments for 2001; (7) if petitioner

_____

[1]Respondent conceded that petitioner is not liable for an addition to tax under sec. 6654 for 2003.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*3]** is not liable under section 6651(f), he is liable for additions to tax under section 6651(a)(1) for 2001, 2003, and 2004; and (8) if petitioner is not liable under section 6663, he is liable for an accuracy-related penalty under section 6662(a) for 2002.

## FINDINGS OF FACT

Some of the facts were deemed stipulated under Rule 91(f) and are so found. The stipulated facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Oklahoma at the time his petition was timely filed.

During the years at issue petitioner was married, had three children, and was employed as a construction manager for Petroleum Marketers Equipment Company of Tulsa, Inc. (PMEC).

## I.    2001 Tax Year

At the end of 2001 PMEC issued to petitioner a Form W-2, Wage and Tax Statement (2001 Form W-2). The 2001 Form W-2 reported wages of $152,496.72 and withholding of $4,984.80 for Social Security tax, $2,363.39 for Medicare tax, and zero for Federal income tax. Also in 2001 petitioner received $207.59 of nonemployee compensation for services he provided to another entity, which the entity reported on a Form 1099-MISC, Miscellaneous Income.

**[*4]**   Petitioner did not file a 2001 Form 1040, U.S. Individual Income Tax Return, by its due date or extension date in 2002.  In January 2003 petitioner submitted a Form 1040X, Amended U.S. Individual Income Tax Return, for 2001 (first 2001 Form 1040X).  Petitioner reported adjusted gross income (AGI) of $152,705 but did not specify the source of his income (e.g., whether it was income from wages, interest, dividends, etc.).  He claimed itemized deductions of $163,054 and exemptions of $5,300, to total zero taxable income.   Petitioner also reported income tax withholding of $4,985 and claimed a refund of $4,985, an amount equal to the Social Security tax PMEC had previously withheld, but did not specify the source from which tax was withheld.

Petitioner submitted with his first 2001 Form 1040X a Schedule A, Itemized Deductions, and Schedule C, Profit or Loss From Business.  On line 27 of Schedule A, Other Miscellaneous Deductions, petitioner claimed a $152,705 deduction for what he called a "claim of Right founded on USC 26, 1341--compensation for personal labor."  The "claim of right" deduction of $152,705 was equal to the amount of AGI petitioner reported on his first 2001 Form 1040X. On Schedule C petitioner reported gross income of $515 and an offsetting "claim of right" deduction of $515. Petitioner also submitted with his first 2001 Form 1040X an affidavit, which, in part, stated:

[*5]   5) Affiants affirm that the $152,705.00 deduction claimed on line 27 of the attached U.S. Individual Income Tax Return Form 1040 Schedule A Itemized Deduction [sic] is a claim of right adjustment founded on USC Title 26, § 1341.

6) Affiants make "the claim of right" is as [sic] follows:  a) The Affiants are claiming a natural right; b) the natural right is a right to make a living; c) The amount being claimed is a compensation for personal labor that was received as repayment of a debt that was owed to Affiants; d) The debt owed was for personal labor furnished by Affiants; 3) [sic] No profit was made.

7) The law for this claim is founded in 26 CFR 1.861-8(a)(5)(i) and USC Title 26 § 1341 * * *

In September 2005 petitioner submitted a second Form 1040X for 2001 (second 2001 Form 1040X).  Petitioner reported zero AGI.  In the "Explanation of Changes to Income, Deductions, and Credits" section of the second 2001 Form 1040X, petitioner stated:  "1099 + W-2 Payer made an error concluding I was an IRC 3401(c) employee and earned 3401(a) wages."  Petitioner submitted with his second 2001 Form 1040X a self-prepared Form 4852, Substitute for Form W-2, Wage and Tax Statement, or Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., (2001 Form 4852), reporting zero wages.  The 2001 Form 4852 required petitioner to explain his efforts to obtain a corrected Form W-2; petitioner stated:

**[*6]** "Requested, but the company refuses to issue forms correctly listing payments a[s] wages as defined in 3401(a) and 3121(a)".

In contrast to the amounts reported on his first 2001 Form 1040X, on his second 2001 Form 1040X petitioner reported income tax withholding of $7,348.29, resulting in a second refund claim increased to $7,348.29, an amount reflecting the Social Security tax and Medicare tax PMEC had previously withheld.

Respondent determined that neither the first 2001 Form 1040X nor the second 2001 Form 1040X was a valid return and did not process either return.

II.    2002 Tax Year

In 2002 petitioner submitted to PMEC a Form W-4, Employee's Withholding Allowance Certificate, claiming that he was exempt from tax. At the end of 2002 PMEC issued to petitioner a Form W-2 (2002 Form W-2). The 2002 Form W-2 reported wages of $44,760.62 and withholding of $3,039.01 for Social Security tax, $710.60 for Medicare tax, and no withholding for Federal income tax.

Petitioner timely submitted a Form 1040 for 2002. Petitioner reported income from wages of $44,761 and AGI of $44,761 and claimed itemized deductions of $51,587 and exemptions of $6,000, to total zero taxable income.

**[*7]** Petitioner also reported income tax withholding of $3,750, resulting in a refund claim of $3,750, an amount equal to the Social Security tax and Medicare tax PMEC had previously withheld. Again, petitioner claimed a deduction for what he called a "claim of right" on Schedule A in an amount equal to his Form W-2 wages. Attached to petitioner's 2002 return was an affidavit that was identical to the affidavit attached to the first 2001 Form 1040X except for the amount of deduction claimed, which for 2002 was $44,761. See supra p. 5.

In September 2005 petitioner submitted a Form 1040X for 2002. Petitioner reported AGI of zero, itemized deductions or standard deduction of $7,800, exemptions of $6,000, and negative taxable income of $11,852. Petitioner reported income tax withholding of $3,750, resulting in a refund claim of $3,750. As with his second 2001 Form 1040X, in the "Explanation of Changes to Income, Deductions, and Credits" section, petitioner wrote: "W-2 Payer made an error concluding I was an IRC 3401(c) employee and earned 3401(a) wages."

Petitioner submitted with his 2002 Form 1040X a self-prepared Form 4852 (2002 Form 4852) reporting zero wages. The 2002 Form 4852 required petitioner to explain his efforts to obtain a corrected Form W-2; petitioner again wrote: "Requested, but the company refuses to issue forms correctly listing payments a[s] wages as defined in 3401(a) and 3121(a)".

**[*8]**  Petitioner's timely filed 2002 Form 1040 was accepted as a valid return and processed.  Respondent determined that petitioner's 2002 Form 1040X was not a valid return and did not process it.

III.  2003 Tax Year

At the end of 2003 PMEC issued to petitioner a Form W-2 (2003 Form W-2).  The 2003 Form W-2 reported wages of $68,444.95 and withholding of $4,672.55 for Social Security tax, $1,092.92 for Medicare tax, and $5,670.66 for Federal income tax.  Also at the end of 2003 PMEC issued to petitioner a Form 1099-MISC reporting $304.

Petitioner did not file a Form 1040 for 2003 by its due date or extension date in 2004.  In September 2005 petitioner submitted a Form 1040 for 2003.  Petitioner drew a line through all of the income items and did not report any income or AGI.  Petitioner reported income tax withholding of $11,436.13 and claimed a refund of $11,436.13, an amount equal to the Federal income tax, Social Security tax, and Medicare tax PMEC had previously withheld.

Petitioner submitted with his 2003 Form 1040 a self-prepared Form 4852 (2003 Form 4852) reporting zero wages.  The 2003 Form 4852 required petitioner to explain his efforts to obtain a corrected Form W-2; once again, petitioner wrote:

**[*9]** "Requested, but the company refuses to issue forms correctly listing payments a[s] wages as defined in 3401(a) and 3121(a)".

Respondent determined that petitioner's 2003 Form 1040 was not a valid return and did not process it.

IV.    2004 Tax Year

At the end of 2004 PMEC issued to petitioner a Form W-2 (2004 Form W-2). The 2004 Form W-2 reported wages of $28,251.58 and withholding of $1,994.66 for Social Security tax, $466.49 for Medicare tax, and $858.64 for Federal income tax. Also at the end of 2004 PMEC issued to petitioner a Form 1099-MISC reporting $2,320.73.

Petitioner submitted a Form 1040 for 2004 on September 6, 2005. Petitioner again drew a line through all of the income items and did not report any income or AGI. Petitioner reported income tax withholding of $3,319.79 and claimed a refund of $3,319.79, an amount equal to the Federal income tax, Social Security tax, and Medicare tax PMEC had previously withheld.

Petitioner submitted with his 2004 tax return a self-prepared Form 4852 (2004 Form 4852) reporting zero wages. The 2004 Form 4852 required petitioner to explain his efforts to obtain a corrected Form W-2; as with every other Form

[*10] 4852, petitioner wrote: "Requested, but the company refuses to issue forms correctly listing payments a[s] wages as defined in 3401(a) and 3121(a)".

Respondent determined that petitioner's 2004 Form 1040 was not a valid income tax return and did not process it.

## V. Revenue Agent Examination

Revenue Agent Jeffers (RA Jeffers) was assigned to examine petitioner's tax returns for 2001-2004. RA Jeffers credibly testified that petitioner was uncooperative and that he continuously asserted frivolous arguments throughout the examination process. Petitioner failed to appear for three different scheduled appointments with RA Jeffers. In a letter dated May 3, 2003, petitioner submitted to the Internal Revenue Service (IRS) the same affidavit that was attached to his 2002 Form 1040 in which he asserted a "claim of right" deduction. In another letter petitioner submitted to RA Jeffers dated October 13, 2004, petitioner stated that he and his wife were "private citizens and non-taxpayers, as legally defined." RA Jeffers issued to petitioner publications addressing topics such as why citizens of the United States must pay taxes and the truth about frivolous tax arguments. After failing to receive documentation from petitioner, RA Jeffers issued summonses to PMEC, and to Bank of America for petitioner's bank records.

[*11] Petitioner responded by writing a letter dated January 28, 2005, to Bank of America urging it not to comply with the summons.

VI.   Petitioner's Bank Records

Petitioner endorsed checks and deposited moneys received from PMEC and various other sources into several different bank accounts at Local Oklahoma Bank.[3]  One such account was petitioner's personal checking account that he held jointly with his wife (personal account), while another was held in the names of petitioner's wife and daughter.

A.   Petitioner's Personal Account[4]

Petitioner deposited most of the paychecks he received from PMEC into his personal account.  Several times each month in 2002 and 2003, petitioner or his wife wrote checks from petitioner's personal account made payable to Braechele Resources, Inc. (Braechele), for approximately $450-$500 per check.

---

[3]The Local Oklahoma Bank lists itself as the "International Bank of Commerce" on its bank records.  The Court will refer to the bank as "Local Oklahoma Bank".

[4]Respondent introduced into evidence the bank records for petitioner's personal account for 2001, 2002, and 2003; the 2004 bank records were not introduced into evidence.

[*12] B.    <u>Wife and Daughter's Account</u>[5]

On occasion, petitioner would deposit checks made out to him into the account held in the names of his wife and daughter. As with petitioner's personal account, in 2002 and 2003 the account held in the names of petitioner's wife and daughter made regular payments to Braechele. Also in 2002 and 2003 Braechele issued checks made payable to petitioner's daughter that were deposited into the account held in the names of petitioner's wife and daughter.

VII.   Petitioner's Concealed Bank Records

In addition to depositing moneys into his personal account and the account held in the names of his wife and daughter, petitioner also deposited moneys received from various sources into another Local Oklahoma Bank account held in the name of Theocentric Foundation (Theocentric account) and a Bank of America account held in the name of Braechele (Braechele account). Although the Braechele and Theocentric accounts were in the names of business entities, petitioner used the funds deposited into these accounts to pay the personal living expenses of himself and his family. Petitioner has identified these accounts, but

---

[5]Respondent introduced into evidence the bank records for the account held in the names of petitioner's wife and daughter for 2001, 2002, and 2003; the 2004 bank records were not introduced into evidence.

[*13] he has failed to explain any business purpose for either the Theocentric account or the Braechele account.

A.  Theocentric Account[6]

Petitioner opened the Theocentric account with Local Oklahoma Bank in October 2002.  On Local Oklahoma Bank's "Business Application / Signature Card" petitioner indicated that Theocentric Foundation (Theocentric) was a "corporation sole",[7] but he did not provide a taxpayer identification number or any other identifying information other than Theocentric's name and address. Petitioner designated himself as "overseer" of Theocentric.  As overseer, petitioner had full control over the corporation sole, including signature authority.  In 2002 and 2003 petitioner occasionally caused Theocentric to write checks made payable

---

[6]Respondent introduced into evidence the bank records for the Theocentric account for 2002 and 2003; the 2004 bank records were not introduced into evidence.

[7]Historically, a "corporation sole" is a succession of persons holding an ecclesiastical or monarchial office.  See Gardner v. Commissioner, 145 T.C. __, __ (slip op. at 7) (Aug. 26, 2015) (citing Black's Law Dictionary 342 (7th ed. 1999), and Bryan A. Garner, A Dictionary of Modern Legal Usage 225 (2d ed. 1995)). Corporations sole are authorized under the laws of some States to enable religious leaders to hold property and conduct business for the benefit of the religious entity, as opposed to the benefit of the officeholder himself.  See id. (citing Rev. Rul. 2004-41, 2004-1 C.B. 845).  The record does not reflect whether petitioner actually took the steps necessary to organize Theocentric as a corporation sole under the laws of any State.

[*14] to Braechele and consistently used funds deposited into the Theocentric account to pay his personal living expenses, including his credit card and cell phone bills. Petitioner has failed to explain any business purpose for the Theocentric account.

B.     Braechele Account[8]

Braechele was incorporated in the State of Nevada on April 16, 2001. On its Form SS-4, Application for Employer Identification Number, William Reed was listed as the principal officer of Braechele. In its articles of incorporation, Braechele stated that its first board of directors would consist of one member, Mr. Reed. On another document submitted to Bank of America, Mr. Reed was listed as Braechele's president, secretary, treasurer, and director. On Bank of America's "Signatory Notarization Form" Mr. Reed was listed as the person with signature authority over the Braechele account. On its Form SS-4, however, Braechele listed its business address as the same address petitioner had consistently listed on his IRS filings, and the account statements for the Braechele account were mailed to petitioner's address.

---

[8]Respondent introduced into evidence the bank records for the Braechele account for 2001, 2002, 2003, and 2004.

[*15] Petitioner routinely deposited personal checks he received from various sources into the Braechele account. In addition, as discussed supra, Braechele received and deposited checks from petitioner's personal account, the account held in the names of petitioner's wife and daughter, and the Theocentric account. During all of the years at issue, petitioner used the Braechele account to pay for the personal living expenses and other personal expenses of himself and his family. Importantly, all checks issued out of the Braechele account were in the name of Braechele and were pre-signed by Mr. Reed. Petitioner admitted during trial that the Braechele account, although in the name of Braechele, was really his personal account.

In summary, much of petitioner's income was concealed in the Braechele and Theocentric accounts. Petitioner sometimes deposited moneys directly into the corporate accounts, but most of the time he deposited moneys he received into his personal account, or, alternatively, into an account held in the names of his wife and daughter. Regular payments were then made to Braechele from petitioner's personal account and the account held in the names of petitioner's wife and daughter. From the Theocentric and Braechele accounts, petitioner would then issue checks in the names of the corporations to pay the personal expenses of himself and his family. Most expenses were paid out of the Braechele

[*16] account, likely because Mr. Reed sent blank, pre-signed checks to petitioner, who then had unfettered discretion to use checks that were in a corporation's name and were not signed by petitioner himself to pay personal expenses.

In fact, in 2012 Mr. Reed pleaded guilty to 1 count of conspiracy to defraud the United States, 31 counts of aggravated identity theft, and 1 count of evasion of payment of tax. As part of the plea memorandum submitted to the U.S. District Court for the District of Nevada, Mr. Reed admitted that he helped form and was a member of the first board of directors of Asset Protection Group, Inc. (APG). In the plea memorandum Mr. Reed also admitted to the following:

> APG's "asset protection" services allowed clients to place funds in bank accounts that could never be traced back to the clients themselves. APG effectuated this process by creating and using Nevada corporations which employed APG as resident agent and nominee officer, via REED. The vast majority of the Nevada corporations listed REED as the nominee officer. The majority of bank accounts established by APG for these newly formed Nevada corporations were opened at Nevada First Bank, which was purchased by Bank of Nevada in 2006. Because REED was the sole officer and director of the Nevada corporations created by APG, REED was usually the sole signor on the Bank of Nevada nominee bank accounts. To allow APG clients to access funds deposited in the nominee accounts, REED would either issue checks on the nominee bank accounts at the direction of the APG clients, or he would send blank, pre-signed, checks to the customers to use at their discretion. The APG clients had complete control of the Nevada corporations and the nominee bank accounts associated with the corporations.

[*17] VIII.  <u>Petitioner's Concealed Real Estate Properties and the Green Family Trust</u>

Petitioner owned several properties, including one on Beech Street, another on 111th Street, and one on Aspen Street, all in Broken Arrow, Oklahoma (Beech Property, 111th Street Property, and Aspen Property, respectively).  According to a uniform residential loan application signed by petitioner on April 20, 2004, the Beech Property, 111th Street Property, and Aspen Property had market values of $165,000, $140,000, and $85,000, respectively.  Dating back to 1996 each of these properties appeared to have been transferred several times between petitioner and several entities for little or no consideration via quitclaim deed or general warranty deed.  Petitioner has failed to explain any business purpose for the multiple transfers.

A.  <u>Beech Property</u>

On April 25, 1996, petitioner purported to transfer the Beech Property to an entity called Beach Properties for consideration of $21.[9]  On August 7, 2001, Beach Properties purported to transfer the Beech Property to Braechele for

_____

[9]The Court is aware of the different spellings--Beech and Beach--that are used for the Beech Property, which is on Beech Street, and the entity Beach Properties.  There is no evidence in the record as to whether "Beach Properties" is a real business entity.

[*18] consideration of $121. On March 18, 2004, Braechele purported to transfer the Beech Property back to petitioner for consideration of $25; petitioner's wife signed the quitclaim deed as Braechele's vice president. On March 30, 2004, Beach Properties purported to transfer the Beech Property back to petitioner for consideration of $10; petitioner signed the quitclaim deed as Beach Properties' authorized agent. Also on March 30, 2004, Braechele again purported to transfer the Beech Property back to petitioner for consideration of $10, but this time petitioner signed the quitclaim deed as Braechele's vice president. Petitioner then purported to transfer the Beech Property to D. Scott Heineman and Kurt F. Johnson, trustees of the Green Family Trust, on June 10, 2004. None of the transfers were reflected on the respective tax returns for the years at issue.

B.     111th Street Property

On January 16, 1998, petitioner signed a quitclaim deed purporting to transfer the 111th Street Property to an entity called Future Resources for consideration of $21. Future Resources then purported to transfer the 111th Street Property to Braechele by quitclaim deed for consideration of $121 on August 7, 2001. On March 18, 2004, Braechele purported to transfer the 111th Street property back to petitioner for consideration of $25; petitioner's wife signed the quitclaim deed as Braechele's vice president. On April 20, 2004, Braechele again

**[*19]** purported to transfer the 111th Street Property to petitioner for consideration of $10, only this time petitioner signed the quitclaim deed as Braechele's vice president. Again, none of the transfers were reflected on the respective tax returns for the years at issue.

### C. Aspen Property

On September 16, 2003, an entity called SEJA-4, L.C., purported to transfer the Aspen Property to petitioner by general warranty deed for consideration of $10. Petitioner then purported to transfer the Aspen Property to Theocentric for consideration of $25 on March 12, 2004. On June 10, 2004, petitioner and his wife again purported to transfer the Aspen Property by quitclaim deed, but this time to Mr. Heineman and Mr. Johnson, trustees of the Green Family Trust. On August 16, 2004, Theocentric purported to transfer the Aspen Property to the Green Family Trust for consideration of $10; petitioner signed the quitclaim deed as Theocentric's overseer. None of the transfers were reported on the respective tax returns for the years at issue.

### D. Green Family Trust

Petitioner and his wife purported to establish the "Green Family Trust", naming Mr. Heineman and Mr. Johnson as trustees.

[*20] In 2004 and 2005 Mr. Heineman and Mr. Johnson ran a mortgage elimination scheme through an entity called the "Dorean Group". In 2005 Mr. Heineman and Mr. Johnson were indicted on charges of conspiracy to commit mail fraud and over 30 counts of mail fraud for their participation in the mortgage elimination scheme; both were ultimately found guilty and sentenced to over 20 years in a Federal penitentiary. Respondent introduced into evidence the indictment against Mr. Johnson and Mr. Heineman that was filed in the U.S. District Court for the Northern District of California. The relevant paragraphs in the indictment state:

> 10. As part of the Dorean Group's debt elimination program, Heineman, Johnson, and the Dorean Group established trusts ("Trusts"). The trustees of the Trusts were Heineman and Johnson, and the beneficiaries were the Dorean Group's client. In furtherance of the program, Heineman, Johnson, and the Dorean Group caused Dorean Group clients to record quitclaim deeds with the recorder's office, clerk of the court's office, and register of deeds' office in the jurisdiction in which the Dorean Group's clients' properties were located, whereby clients purportedly transferred their respective interests in mortgaged properties to the corresponding Trusts.

> 11. Heineman, Johnson, and the Dorean Group then caused to be sent by Mail Delivery a "self-executing presentment packet" (hereinafter, "Presentment Packet") consisting of various documents to the lenders of the Dorean Group's clients' loans. In the Presentment Packet, Heineman, Johnson, and the Dorean Group claimed to be authorized to act on behalf of the borrower and demanded the lender to prove the validity of its loan to the borrower within 10 days * * *. Wording in the Presentment Packet further

**[*21]** alleged that if the lender failed to prove the validity of the loan, the Dorean Group would deem this to be the lender's "tacit asset" and "default," and would act as the lender's agent and attorney-in-fact to "correct title" on the property secured by the lender's loan.

12. After a Presentment Packet was sent by Mail Delivery to the lender of a Dorean Group client's loan, and at least 10 days had elapsed, Heineman, Johnson, and the Dorean Group caused a * * * "Specific Power of Attorney" * * * to be sent, typically by Mail Delivery, to the recorder's office, clerk of the court's office, and register of deeds' office in the jurisdiction in which each client's property was located to be recorded on the client's property title. In this recordation, on which Heineman's signature typically appeared, Heineman, and if he was not able, Johnson, was purportedly acting as agent and attorney-in-fact on behalf of the lender.

13. Acting allegedly on behalf of the lender as its agent and/or attorney-in-fact, Heineman, Johnson, and the Dorean Group caused a * * * "Discharge of Mortgage" * * * to be sent, typically by Mail Delivery, to the recorder's office, clerk of the court's office, and register of deeds' office in the jurisdiction in which the Dorean Group client's property was located to be recorded as part of that property's title. In this recordation * * * it was falsely claimed that the loan secured by the property had been fully paid, when such loan had not been fully repaid. This recordation caused the Dorean Group client's property title to falsely appear free and clear of any encumbrances, when the lender's secured loan had not been fully paid.

14. With title appearing free and clear of any encumbrances, Heineman, Johnson, and the Dorean Group caused at least five of its clients to successfully obtain a refinance loan from a separate lender. When a refinance loan was obtained, the Dorean Group * * * received 50% of the refinance loan's proceeds, the Dorean Group client retained approximately 25-40% of the proceeds * * *

[*22] Respondent introduced the following documents into evidence to demonstrate that petitioner participated in this mortgage elimination scheme: on a uniform residential loan application signed April 20, 2004, petitioner stated that the Aspen Property was subject to a mortgage of $63,000; petitioner caused to be recorded with the recorder's office a quitclaim deed signed on June 10, 2004, whereby petitioner and his wife purported to transfer the Aspen Property to Mr. Heineman and Mr. Johnson in their capacity as trustees of the Green Family Trust; Mr. Heineman then signed and sent to the recorder's office a discharge of mortgage which claimed that the mortgage on the Aspen Property was fully paid and requested the register of deeds to discharge the mortgage; and attached to the discharge of mortgage was a specific power of attorney through which Mr. Heineman purported to be the attorney-in-fact of Countrywide Home Loans.

In March 2015 the U.S. District Court for the Northern District of Oklahoma determined that petitioner had attempted to participate in the mortgage elimination scheme by creating the Green Family Trust and naming Mr. Heineman and Mr. Johnson as purported trustees. See United States v. Green, No. 12-CV-441-JED-FHM, 2015 WL 1482508 (N.D. Okla. Mar. 31, 2015), aff'd sub nom. United States v. Wells Fargo Home Mortg., __ F. App'x __, 2015 WL 7567269

**[*23]** (10th Cir. Nov. 25, 2015).[10] The District Court ordered that all transfers of the Beech Property, 111th Street Property, and Aspen Property made to the Green Family Trust were null, void, and without effect. Id., 2015 WL 7567269, at *4. In addition, the District Court ordered that all instruments filed by the Greens, Mr. Heineman, or Mr. Johnson in an attempt to extinguish or diminish the lien rights of the mortgagee banks, including any specific power of attorney and discharge of mortgage, were null, void, and without effect. Id.

IX. Substitutes for Returns

Respondent prepared substitutes for returns under section 6020(b) for petitioner's tax years 2001, 2003, and 2004 stating that petitioner had unreported wage or salary income of $152,496, $68,444, and $28,251 and unreported business income of $207, $304, and $2,320 for 2001, 2003, and 2004, respectively. In addition, the substitute for return for petitioner's 2004 tax year stated that petitioner was subject to self-employment tax of $328. These substitutes for returns consisted of Forms 4549, Income Tax Examination Changes, Forms 886-A, Explanation of Items, and Forms 13496, IRC Section

---

[10]The Court takes judicial notice of the U.S. District Court for the Northern District of Oklahoma's decision and the U.S. Court of Appeals for the Tenth Circuit's affirmation.

[*24] 6020(b) Certification, which were signed by an authorized IRS official or employee.

OPINION

I.   Unreported Income

   A.   Burden of Proof

Generally, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of showing the determinations are in error.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  When a case involves unreported income, the U.S. Court of Appeals for the Tenth Circuit, to which this case would be appealable absent a stipulation to the contrary, has held that the Commissioner's determination of unreported income is entitled to a presumption of correctness once some substantive evidence is introduced demonstrating that the taxpayer received unreported income.  United States v. McMullin, 948 F.2d 1188, 1192 (10th Cir. 1991).  Once the Commissioner introduces some substantive evidence linking the taxpayer to the income, the presumption of correctness applies and the burden shifts to the taxpayer to produce substantial evidence overcoming it.  Id.

Respondent introduced into evidence Forms W-2 and Forms 1099-MISC for 2001, 2003, and 2004.  The record establishes and petitioner admitted at trial that

**[\*25]** he received payments as reported for 2001, 2003, and 2004. The Court concludes that respondent has laid the requisite minimal evidentiary foundation for the contested unreported income and that respondent's determinations are entitled to the presumption of correctness.

Section 7491(a) shifts the burden of proof to the Commissioner if the taxpayer produces credible evidence on any factual issues and satisfies the requirements of section 7491(a)(2). Petitioner did not argue for the applicability of section 7491(a) and has not shown that he meets the requirements to shift the burden; therefore, the burden of proof remains his.

B.    Gross Income

The notice of deficiency for 2001, 2003, and 2004 was based on substitutes for returns prepared by respondent under section 6020(b). On the basis of the Forms W-2 and Forms 1099-MISC, substitutes for returns were prepared in which respondent determined that petitioner had unreported wage or salary income of $152,496, $68,444, and $28,251 and unreported business income of $207, $304, and $2,320 for 2001, 2003, and 2004, respectively.

Section 61(a)(1) and (2) defines gross income as "all income from whatever source derived", including compensation for services and gross income derived

**[\*26]** from business.  Wages and salaries are compensation for services that are includible in gross income.  See sec. 1.61-2(a), Income Tax Regs.

Petitioner admitted at trial to receiving compensation for services as reported on Forms W-2 and Forms 1099-MISC for 2001, 2003, and 2004.  That compensation falls within the definition of gross income under section 61(a).  Petitioner has made many unfounded arguments--including an assertion that wages are not income--which lead him to his conclusion that he is not liable for Federal income tax, all of which, this Court and the U.S. Court of Appeals for the Tenth Circuit have consistently held, lack even colorable merit and are frivolous.  See Lonsdale v. United States, 919 F.2d 1440, 1448 (10th Cir. 1990) (the following arguments, among others, made by the taxpayers were "completely lacking in legal merit and patently frivolous":  (1) wages are not income, (2) no statutory authority exists for imposing an income tax on individuals, and (3) the Commissioner has no power or authority to administer the Internal Revenue laws);  Aldrich v. Commissioner, T.C. Memo. 2013-201, at \* 9 (taxpayer's argument that the "lack of underlying Code of Federal Regulations to support the statutes" nullified the statutes was frivolous); Garber v. Commissioner, T.C. Memo. 2012-47, 2012 WL 570728, at \* 2 (taxpayer's claims that the Commissioner was unable to provide him with any section of the Code that would make the taxpayer liable

**[*27]** for Federal income tax and that he was not a withholding agent were frivolous and devoid of any basis in law), aff'd, 500 F. App'x 540 (7th Cir. 2013); Lindberg v. Commissioner, T.C. Memo. 2010-67 (taxpayer's argument that her wages were not taxable because the third-party information returns did not correctly apply the definition of wages in section 3121(a) lacked even considerable merit and was frivolous); Carskadon v. Commissioner, T.C. Memo. 2003-237, 2003 WL 21904166, at * 3 (taxpayers' argument that wages were not income was frivolous where the arguments were tax defier rhetoric "based on mere semantics" and unsupported by the law); Corcoran v. Commissioner, T.C. Memo. 2002-18, 2002 WL 71029, at * 2 (taxpayer's argument that he had no gross income pursuant to section 861 from sources within the United States and without the United States was completely lacking in merit), aff'd, 54 F. App'x 254 (9th Cir. 2002).  The Court perceives no need to address petitioner's arguments further; to do so might suggest that these arguments have some colorable merit.  See Crain v. Commissioner, 737 F.2d 1417, 1417 (5th Cir. 1984); Wnuck v. Commissioner, 136 T.C. 498, 513 (2011).  Accordingly, respondent's determinations with respect to petitioner's unreported income for 2001, 2003, and 2004 are sustained, and

[*28] respondent's determination that petitioner is liable for self-employment tax for 2004 is sustained.[11]

## II.     2002 Deduction Based on Sections 861 and 1341

Deductions and credits are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any deduction or credit claimed on a return. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). As with the unreported income issue, see supra p. 25, petitioner did not argue for the applicability of section 7491(a) and has not shown that he meets the requirements to shift the burden; therefore, the burden of proof remains his.

Respondent processed petitioner's 2002 income tax return but disallowed what petitioner had termed a "claim of right" deduction on his Schedule A of $44,761. Petitioner's claimed deduction was equal to the wages he received from PMEC in 2002. In the affidavit attached to his 2002 Form 1040, petitioner stated that the deduction was based on section 1341 and section 1.861-8(a)(5)(i), Income Tax Regs., for "compensation for personal labor that was received as repayment of

_____

[11]On the basis of petitioner's business income of $2,320 in 2004, respondent determined that petitioner is liable for self-employment tax of $328 for 2004, taking into account the deduction allowed by sec. 164. See sec. 1401. Petitioner did not challenge this determination in his petition.

**[*29]** a debt". As discussed <u>supra</u>, petitioner's argument is the type of frivolous argument that this Court and the U.S. Court of Appeals for the Tenth Circuit have consistently rejected. See e.g., <u>Lonsdale</u>, 919 F.2d at 1448; <u>Carskadon v. Commissioner</u>, 2003 WL 21904166, at *3; <u>Corcoran v. Commissioner</u>, 2002 WL 71029, at * 2. Accordingly, respondent's disallowance of petitioner's 2002 Schedule A deduction based on sections 861 and 1341 is sustained.

III.    <u>Section 6651(f) Addition to Tax</u>

Respondent determined petitioner was liable for the section 6651(f) fraudulent failure to file addition to tax for 2001, 2003, and 2004.

Section 6651(a)(1) imposes an addition to tax for failure to timely file a Federal income tax return. Section 6651(f) provides that the subsection (a)(1) addition to tax shall be increased from 5% to 15% of the tax required to be shown on the return for each month or fraction thereof for which there is a failure to file a return, up to 75% in the aggregate, where such failure to timely file is fraudulent. In ascertaining whether a taxpayer's failure to timely file was fraudulent under section 6651(f), the Court considers whether the taxpayer (1) failed to timely file a return for the taxable year where there was a tax liability required to be shown on a return (2) because of fraudulent intent. See sec. 6651(a), (b)(1), (f); <u>Clayton v. Commissioner</u>, 102 T.C. 632, 653 (1994); <u>Porter v. Commissioner</u>, T.C. Memo.

[*30] 2015-122, at *44.  Respondent has the burden of proving these elements by clear and convincing evidence for each year for which fraud is alleged.  Sec. 7454(a); Rule 142(b); see Zell v. Commissioner, 763 F.2d 1139, 1142 (10th Cir. 1985), aff'g T.C. Memo. 1984-152; Clayton v. Commissioner, 102 T.C. at 646; Porter v. Commissioner, at *44; Taylor v. Commissioner, T.C. Memo. 1995-269, 1995 WL 363202, at *5, aff'd without published opinion, 108 F.3d 1388, 1997 WL 139744 (10th Cir. 1997).

A.      Whether Petitioner Filed Valid Returns

Because section 6651(f) increases the addition to tax imposed by subsection (a)(1), respondent first must prove that petitioner failed to timely file a required Federal tax return.  See sec. 6651(a)(1).  Respondent introduced Forms W-2 showing that petitioner earned enough income to require him to make a return for each of the years at issue.  See secs. 6011(a), 6012(a)(1)(A).  Although petitioner submitted documents purporting to be returns for 2001, 2003, and 2004, respondent determined that those returns were invalid.

The Code does not define what constitutes a valid return.  See Appleton v. Commissioner, 140 T.C. 273, 284 (2013).  On the basis of the Supreme Court's opinions in Zellerbach Paper Co. v. Helvering, 293 U.S. 172 (1934), and Florsheim Bros. Drygoods Co. v. United States, 280 U.S. 453 (1930), this Court

[*31] has established a four-part test to determine whether a document submitted by a taxpayer is a valid return. In order to qualify as a return, the document must meet the following requirements: (1) the document must contain sufficient data to calculate tax liability; (2) the document must purport to be a return; (3) there must be an honest and reasonable attempt to satisfy the requirements of the tax law; and (4) the taxpayer must execute the return under penalties of perjury. Beard v. Commissioner, 82 T.C. 766, 777 (1984), aff'd, 793 F.2d 139 (6th Cir. 1986); see Estate of Sanders v. Commissioner, 144 T.C. 63, 78 (2015); Appleton v. Commissioner, 140 T.C. at 284-285. This Court and the U.S. Court of Appeals for the Tenth Circuit have consistently held that a Form 1040 with zeros on every income line is devoid of financial data and is therefore not a valid return. See, e.g., United States v. Melot, 562 F. App'x 646, 651 (10th Cir. 2014); United States v. Rickman, 638 F.2d 182, 184 (10th Cir. 1980) (holding that a document that does not provide information from which a tax can be computed is not a return); Cabirac v. Commissioner, 120 T.C. 163, 169 (2003). Petitioner's second 2001 Form 1040X and Forms 1040 for 2003 and 2004 reported zeros on every income line. Accordingly, petitioner's second 2001 Form 1040X and Forms 1040 for 2003 and 2004 were not valid tax returns.

**[*32]** Petitioner did not file a Form 1040 for 2001; instead, petitioner filed two Forms 1040X. Although the first 2001 Form 1040X reported AGI of $152,705, the return lacked information sufficient to apprise respondent of petitioner's Federal tax liability and misrepresented Social Security tax withheld as Federal income tax withheld. Even if the first 2001 Form 1040X had not misrepresented petitioner's Federal income tax withholding, the return lacked information sufficient to apprise respondent of petitioner's Federal tax liability because it does not contain any information as to the source of income from which tax was purportedly withheld. See United States v. Rickman, 638 F.2d at 184 (where the taxpayer reported zero income, requested a refund of tax withheld, but did not make disclosures from which a tax might be determined, the Court held that the return did not contain information from which a tax could be computed and was not an honest and reasonable attempt to satisfy the requirements of the tax law); Oman v. Commissioner, T.C. Memo. 2010-276, 2010 WL 5209360, at *10 (applying the Beard test, the Court determined that a taxpayer's Form 1040 did not contain sufficient data to calculate tax liability where the return showed $6,055 tax withheld but did not contain any information as to income from which such tax was purportedly withheld). Because petitioner's first 2001 Form 1040X did not

**[\*33]** contain sufficient data to calculate the tax liability, it was not a valid tax

return. See Rickman, 638 F.2d at 184; Beard v. Commissioner, 82 T.C. at 777.

Respondent has clearly and convincingly proven that petitioner had an

obligation to file timely income tax returns showing tax liabilities for 2001, 2003,

and 2004, and failed to do so.[12]

B. Whether Petitioner's Failure to File Was Fraudulent

In determining whether a taxpayer had the requisite fraudulent intent for

imposition of the section 6651(f) addition to tax, the Court considers the same

elements that it considers in imposing the fraud penalty under section 6663 and

former section 6653(b)(1). Clayton v. Commissioner, 102 T.C. at 653. Fraud is

established by proving that a taxpayer intended to evade tax believed to be owing

by conduct intended to conceal, mislead, or otherwise prevent the collection of

tax. Zell v. Commissioner, 763 F.2d at 1142-1143; Clayton v. Commissioner, 102

T.C. at 647. The existence of fraudulent intent is determined by looking at the

entire record and the taxpayer's conduct. See DiLeo v. Commissioner, 96 T.C.

---

[12]Because sec. 6651(f) is keyed to subsec. (a)(1), a taxpayer cannot be liable for a subsec. (f) addition to tax if the failure to file is due to reasonable cause and not willful neglect. See sec. 6651(a)(1); Mohamed v. Commissioner, T.C. Memo. 2013-255, at \*22-\*23. Petitioner bears the burden of proof with regard to the "reasonable cause" exception of sec. 6651(a)(1), see Higbee v. Commissioner, 116 T.C. 438, 447 (2001), and he did not meet this burden.

**[\*34]** 858, 874 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992); Taylor v. Commissioner, 1995 WL 363202, at * 5.  Fraud is never presumed and must be proven by independent evidence.  Zell v. Commissioner, 763 F.2d at 1143; Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Taylor v. Commissioner, 1995 WL 363202, at *5.  Fraud need not be established by direct evidence, which is rarely available, but may be proved by circumstantial evidence and reasonable inferences drawn from the facts.  Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992); Taylor v. Commissioner, 1995 WL 363202, at *5.

In determining whether there was fraudulent intent, the Court will look at a nonexclusive list of factors, or "badges of fraud."  See Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Niedringhaus v. Commissioner, 99 T.C. at 211; Recklitis v. Commissioner, 91 T.C. 874, 910 (1998); Taylor v. Commissioner, 1995 WL 363202, at *5.  These factors include: (1) failing to file income tax returns; (2) filing false documents, including false income tax returns; (3) understating income; (4) concealing income or assets; (5) engaging in illegal activity; (6) failing to cooperate with tax authorities; and (7) asserting frivolous arguments and objections to the tax laws.  Bradford v. Commissioner, 796 F.2d at 307; Niedringhaus v. Commissioner, 99 T.C. at 211; Taylor v. Commissioner, 1995 WL 363202, at *5.  While no single factor is

**[*35]** determinative for establishing fraud, the existence of several "badges of fraud" may constitute compelling circumstantial evidence of fraud. Bradford v. Commissioner, 796 F.2d at 307-308; Niedringhaus v. Commissioner, 99 T.C. at 211; Taylor v. Commissioner, 1995 WL 363202, at *5. The U.S. Court of Appeals for the Tenth Circuit has held that willful refusal to file or the filing of protest returns is not by itself enough to justify fraud penalties; rather, when a taxpayer fails to file a return, he is not liable for fraud penalties unless he commits some affirmative act of concealment or misrepresentation. Zell v. Commissioner, 763 F.2d at 1146.

Petitioner's behavior exhibits many of the badges listed above.

        (1)     Failing To File Income Tax Returns

While the mere failure to file a return, standing alone, is not sufficient to support a finding of fraud, see id., an extended pattern of failing to file returns is a badge of fraud and may be persuasive circumstantial evidence of the intent to evade tax. See Bradford v. Commissioner, 796 F.2d at 308; Petzholdt v. Commissioner, 92 T.C. 661, 701 (1989). Petitioner failed to file valid Federal

**[\*36]** income tax returns for 2001, 2003, and 2004, as discussed <u>supra</u>. This factor weighs against petitioner for 2001, 2003, and 2004.

### (2) Filing False Documents

Filing false documents with the IRS constitutes an "affirmative act" of misrepresentation sufficient to justify the fraud penalty. <u>Zell v. Commissioner</u>, 763 F.2d at 1146. Petitioner filed false documents with the IRS for 2001, 2003, and 2004. For each year, petitioner submitted an invalid Form 1040 or Form 1040X and submitted false Forms 4852 reporting zero wages after unsuccessfully attempting to persuade PMEC to submit false Forms W-2. Not only did petitioner attempt to evade income tax by filing false returns, but each year he attempted to have Social Security and Medicare tax erroneously refunded to him by reporting those amounts as income tax withholding. This factor weighs against petitioner for 2001, 2003, and 2004.

### (3) Understating Income

A pattern of substantially underreporting income for several years is strong evidence of fraud, particularly if the understatements are not due to innocent mistake or are not otherwise satisfactorily explained. <u>See</u> <u>Holland v. United States</u>, 348 U.S. 121, 137-139 (1954); <u>Spies v. United States</u>, 317 U.S. 492, 499 (1943); <u>Marcus v. Commissioner</u>, 70 T.C. 562, 577 (1978), <u>aff'd without</u>

[*37] published opinion, 621 F.2d 439 (5th Cir. 1980); Taylor v. Commissioner, 1995 WL 363202, at *6.  Petitioner admitted that he received all amounts that were reported on his Forms W-2 and Forms 1099-MISC, yet he either reported zero income or attempted to "zero out" his income by claiming deductions in amounts equal to his income under the frivolous "claim of right".  This factor weighs against petitioner for 2001, 2003, and 2004.

### (4)    Concealing Income and Assets

An intent to evade tax may be inferred from "concealment of assets or covering up sources of income." Spies, 317 U.S. at 499.  Concealing assets coupled with a failure to file tax returns is a strong indication of fraud.  Freidus v. Commissioner, T.C. Memo. 1999-195, 1999 WL 391919, at *10.  A taxpayer's use of nominee corporations is evidence of asset concealment.  See Bennett v. Commissioner, T.C. Memo. 2014-256, at *12 (finding a taxpayer liable for the section 6651(f) addition to tax where he adopted various means of concealing income by diverting income to nominees); Lain v. Commissioner, T.C. Memo. 2012-99, 2012 WL 1129851, at *5 ("Placing title to assets in the name of a nominee evidences a taxpayer's fraudulent intent."); DeVries v. Commissioner, T.C. Memo. 2011-185, 2011 WL 3418248, at *7 (finding that placing title to assets in the name of nominees evidences that the taxpayer's failure to file tax

[*38] returns was done with fraudulent intent for the taxpayer to be subject to the section 6651(f) addition to tax); Freidus v. Commissioner, 1999 WL 391919, at * 11 (finding that the taxpayer used corporate accounts as mere repositories for proceeds derived from the taxpayer's income-producing activities); Jones v. Commissioner, T.C. Memo. 1994-230, (finding that a taxpayer's use of alter ego corporations to conduct personal as well as business transactions was evidence of asset concealment), aff'd without published opinion, 68 F.3d 460 (4th Cir. 1995). A nominee is an entity or individual who holds bare legal title to assets owned by another entity or individual. See Oxford Capital Corp v. United States, 211 F.3d 280, 284 (5th Cir. 2000); DeVries v. Commissioner, 2011 WL 3418248, at *7.

Perhaps most damning to petitioner, respondent introduced clear and convincing evidence that petitioner went to great lengths to affirmatively act to conceal income and assets. Petitioner used at least two corporate nominee bank accounts--the Braechele and Theocentric accounts--to conceal personal income.

Respondent introduced clear and convincing evidence in the form of bank records showing that much of petitioner's income flowed into and then out of the Braechele and Theocentric accounts. The Braechele and Theocentric accounts, however, were nothing more than corporate nominees; all income and expenses flowing therefrom were chargeable to petitioner. Petitioner would either deposit

**[\*39]** personal income directly into one of the corporate nominee accounts or deposit income into his personal account or an account held in the names of his wife and daughter and then make a separate payment from his personal account or his wife and daughter's account to one of the corporate nominee accounts. Perhaps most alarming and the strongest evidence of petitioner's intent to conceal income and assets is the fact that petitioner received and had unfettered discretion to use blank checks in the name of Braechele that were pre-signed by Mr. Reed. Petitioner used those checks to pay the personal expenses of himself and his family. In other words, petitioner deliberately funneled his income into Braechele with the expectation that it would come out of the funnel without being able to be traced back to him. The Braechele account as structured and operated by petitioner is the scheme devised by Mr. Reed; the same scheme that lead Mr. Reed to plead guilty to conspiracy to defraud the United States, aggravated identity theft, and evasion of payment of tax. Petitioner has not attempted to argue that a legitimate business purpose exists for either the Braechele or Theocentric accounts; to the contrary, petitioner openly admitted at trial that the Braechele account was his personal account. On the basis of the evidence presented to the Court, respondent has convincingly established that petitioner created at least the Braechele and Theocentric accounts for the purpose of concealing his personal

**[\*40]** income under the guise of corporate nominees Braechele (and Mr. Reed) and

Theocentric in 2001, 2003, and 2004.[13] This factor weighs against petitioner for

2001, 2003, and 2004.

In addition to concealing income in corporate nominee bank accounts,

petitioner used corporate nominees to conceal assets. The Court has previously

held that placing title to assets in the name of nominees evidences fraudulent

intent for a taxpayer to be subject to the section 6651(f) addition to tax. See

DeVries v. Commissioner, 2011 WL 3418248, at \*7; Leggett v. Commissioner,

T.C. Memo. 1999-100, aff'd without published opinion, 221 F.3d 1357 (11th Cir.

2000). Petitioner purported to transfer the Beech Property, 111th Street Property,

and Aspen Property between himself and several nominee corporations in attempt

to conceal the properties. These properties, valued at $165,000, $140,000, and

$85,000, respectively, were purportedly transferred several times for consideration

not exceeding $121 on any transfer. Often times petitioner or his wife signed on

---

[13]Even though respondent did not introduce into evidence the 2004 bank records for petitioner's personal account, the account held in the names of petitioner's wife and daughter, and the Theocentric account, the 2004 bank records for the Braechele account, along with petitioner's admissions during trial, establish that petitioner continued to pay personal expenses out of the Braechele account during 2004. Accordingly, respondent convincingly established that the Braechele account continued to be nothing more than a nominee bank account during 2004.

**[*41]** behalf the various entities, indicating that petitioner still controlled the use and disposition of the properties. Petitioner has not presented any evidence or advanced any argument to rebut respondent's assertion that petitioner used Beach Properties, Braechele, Future Resources, Theocentric, and the Green Family Trust as nominees to conceal his personal assets. This factor weighs against petitioner.

(5)    Engaging in Illegal Activity

Engaging in an illegal activity is a badge of fraud. See Niedringhaus v. Commissioner, 99 T.C. at 211. In 2004 petitioner participated in an illegal mortgage elimination scheme by creating the Green Family Trust and then transferring the Aspen Property to the Green Family Trust. After the transfer the "trustees", purporting to be the attorney-in-fact for the lender, then caused a "Specific Power of Attorney" and "Discharge of Mortgage" to be delivered to the recorders office and requested a discharge of mortgage on the Aspen Property. This scheme, as structured and operated by petitioner, is the same scheme for which Mr. Heineman and Mr. Johnson, the "trustees" of the Green Family Trust, were convicted for fraud. This factor weighs against petitioner for 2004.

(6)    Failing To Cooperate With Tax Authorities

Failure to cooperate with revenue agents during an audit is a badge of fraud. See Zell v. Commissioner, 763 F.2d at 1146; Grosshandler v. Commissioner, 75

**[\*42]** T.C. 1, 19-20 (1980); Taylor v. Commissioner, 1997 WL 139744, at \*4.

The Court has previously held that attempting to circumvent the Commissioner's

efforts to obtain records when he has issued a summons evinces a fraudulent

intent.  See Porter v. Commissioner, at \*58-\*59.  Petitioner failed to appear at

three scheduled appointments and attempted to impede RA Jeffers' examination,

first by refusing to submit documents that she requested, then by asserting

frivolous legal arguments, and finally by urging Bank of America to refuse to

comply with her summons of the Braechele account records.  This factor weighs

against petitioner.

(7)     Asserting Frivolous Arguments

Frivolous, irrelevant, and meritless arguments, coupled with affirmative acts

designed to evade Federal income tax, support a finding of fraud.  See Kotmair v.

Commissioner, 86 T.C. 1253, 1259-1261 (1986); Porter v. Commissioner, at \*58.

Not only did petitioner assert frivolous arguments to RA Jeffers, but, as discussed

supra, petitioner has consistently maintained those arguments to the Court in this

case and has previously raised frivolous arguments in other cases before the Court.

See, e.g., Green v. Commissioner, 608 F. App'x 671 (10th Cir. 2015).  The Court

has previously warned petitioner that if he continued to assert frivolous arguments,

**[\*43]** the Court would impose the section 6673 penalty. See id. This factor weighs against petitioner.

### E. Conclusion

Taking the entire record into account, the Court concludes that petitioner's failure to file timely tax returns for 2001, 2003, and 2004 was fraudulent. Although petitioner submitted Forms 1040 or 1040X for 2001, 2003, and 2004, none of those documents were valid returns. Petitioner's failure to file a valid return for each year was deliberate and intended to conceal the fact that he had income subject to tax. Respondent has proven fraudulent intent by showing that petitioner committed affirmative acts of concealment or misrepresentation with respect to each year. See Zell v. Commissioner, 763 F.2d at 1146. Petitioner is therefore liable for the addition to tax under section 6651(f) for 2001, 2003, and 2004. Since petitioner is liable under section 6651(f), there is no need to discuss respondent's alternative position that petitioner is liable under subsection (a)(1).

## IV. Section 6663 Civil Fraud Penalty

Respondent determined that petitioner is liable for the section 6663 civil fraud penalty for 2002.

Section 6663(a) imposes a penalty equal to 75% of a taxpayer's underpayment of Federal income tax that is due to fraud. An "underpayment" for

**[*44]** purposes of the section 6663 civil fraud penalty is, in general, the excess of the amount of tax due over the amount of tax shown on the return. Sec. 6664(a); see Mohamed v. Commissioner, T.C. Memo. 2013-255, at *19. If any portion of the underpayment is attributable to fraud, the entire underpayment will be treated as attributable to fraud unless the taxpayer establishes by a preponderance of the evidence that part of the underpayment is not due to fraud. Sec. 6663(b). In other words, the section 6663 fraud penalty consists of two elements: (1) the existence of an underpayment, and (2) fraudulent intent with respect to some portion of the underpayment. DiLeo v. Commissioner, 96 T.C. at 873. To establish fraud, the Commissioner must prove both elements with clear and convincing evidence. Sec. 7454; Rule 142(b); DiLeo v. Commissioner, 96 T.C. at 873; Taylor v. Commissioner, 1995 WL 363202, at *5.

As discussed supra, petitioner was not entitled to a deduction for what he termed a "claim of right" for 2002; thus an underpayment existed. Respondent clearly and convincingly established the first element of the section 6663 civil fraud penalty.

As discussed supra, in determining whether a taxpayer had the requisite fraudulent intent for imposition of the section 6651(f) addition to tax, the Court considers the same elements that it considers in imposing the fraud penalty under

[*45] section 6663 and former section 6653(b)(1). Clayton v. Commissioner, 102 T.C. at 653. Respondent has introduced clear and convincing evidence that many of the badges of fraud that were present in 2001, 2003, and 2004, discussed supra, were present in 2002 with respect to at least some portion of the 2002 underpayment, thereby proving the second element of fraud. For example, although petitioner filed a valid Form 1040 for 2002,[14] he attempted to zero out his income under the frivolous "claim of right". As he had for 2001, 2003, and 2004, petitioner filed a self-prepared Form 4852 for 2002 showing zero wages after failing to convince PMEC to file a false Form W-2. Although he had not done so for 2001, 2003, and 2004, petitioner submitted a false Form W-4 to his employer for 2002 claiming to be exempt from tax. This Court and the U.S. Court of Appeals for the Tenth Circuit have held that filing a false Form W-4 is an affirmative act of misrepresentation and thus evidence of fraud. See Zell v. Commissioner, 763 F.2d at 1146 (holding that where a taxpayer had not merely failed to file a return but also filed false Forms W-4, thus committing an "affirmative act" of misrepresentation, imposition of fraud penalty was justified);

---

[14]In contrast to petitioner's first Form 1040X for 2001, petitioner's Form 1040 for 2002--which respondent accepted as a valid return--was submitted on the proper form and specified the source--income from wages--of petitioner's income and withholding. Accordingly, the Form 1040 for 2002 contained sufficient data to calculate tax liability.

[*46] Nix v. Commissioner, T.C. Memo. 2012-304, at *11 (filing a false Form W-4 is circumstantial evidence of fraud), aff'd, 553 F. App'x 960 (11th Cir. 2014); Teeters v. Commissioner, T.C. Memo. 2010-244 (where the Commissioner has shown substantial amounts of unreported income on which the withholding has been reduced by submission of a false Form W-4, fraud has been established by clear and convincing evidence). In addition, respondent introduced evidence in the form of bank statements for 2002 to clearly establish that the Braechele and Theocentric accounts were nothing more than corporate nominees through which petitioner concealed his income. See supra pp. 36-39.

On the basis of the entire record, the Court concludes that petitioner is liable for the civil fraud penalty under section 6663 for 2002. Since petitioner is liable under section 6663, the Court will not discuss respondent's alternative position that petitioner is liable for an accuracy-related penalty under section 6662(a).

V.    Section 6651(a)(2) Addition to Tax

Respondent determined that petitioner is liable for additions to tax under section 6651(a)(2) for failure to timely pay his 2001, 2003, and 2004 tax liabilities.

Section 6651(a)(2) provides for an addition to tax of 0.5% per month up to 25% for failure to pay the amounts shown on a return unless it is shown that the

**[\*47]** failure is due to reasonable cause and not due to willful neglect. Section 7491(c) provides that the Commissioner bears the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount.

To satisfy his burden of production, respondent must produce sufficient evidence that petitioner filed returns showing tax liabilities for the years at issue. See Wheeler v. Commissioner, 127 T.C. 200, 210 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008). A return prepared by the Commissioner in accordance with section 6020(b) is treated as the return filed by the taxpayer for the purpose of determining the amount of the addition under section 6651(a)(2). Sec. 6651(g)(2); Wheeler v. Commissioner, 127 T.C. at 208-209.

Respondent has the burden of proving that substitutes for returns satisfying the requirements of section 6020(b) were submitted. See Cabirac v. Commissioner, 120 T.C. at 170; Gleason v. Commissioner, T.C. Memo. 2011-154, 2011 WL 2600917, at \*12; see also Wheeler v. Commissioner, 127 T.C. at 210. To constitute a section 6020(b) substitute for return, "the return must be subscribed, it must contain sufficient information from which to compute the taxpayer's tax liability, and the return form and any attachments must purport to be a 'return'". Rader v. Commissioner, 143 T.C. 376, 382 (2014) (quoting Spurlock

[*48] v. Commissioner, T.C. Memo. 2003-124, 2003 WL 1987156, at *10), aff'd, 616 F. App'x 391 (10th Cir. 2015). The Court has held that the requirements of section 6020(b) have been met where the substitutes for returns consist of Forms 4549-A, Forms 886-A, and Forms 13496. See Rader v. Commissioner, 143 T.C. at 382; Gleason v. Commissioner, 2011 WL 2600917, at *12.

Petitioner's substitutes for returns included Forms 4549-A, Forms 886-A, and Forms 13496.[15] Further, the substitutes for returns purport to be "section 6020(b) returns", contain the information necessary to calculate petitioner's liabilities, and are subscribed. Petitioner's substitutes for returns constitute valid section 6020(b) returns deemed to have been filed by petitioner for purposes of section 6651(a)(2). Accordingly, respondent has satisfied his burden.

Once the Commissioner meets his burden, the burden of proof is with the taxpayer to show that the additions to tax that the Commissioner determined in the notice of deficiency should not be imposed. See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). Petitioner's burden requires that he prove that his failure to timely pay his Federal income tax was due to reasonable cause and was not due to willful neglect. See sec. 6651(a)(2).

_____

[15]The forms contain petitioner's name and address. Petitioner's taxpayer identification number (e.g., Social Security number) has been redacted in accordance with Rule 27(a).

[*49] Petitioner did not pay any of his tax liabilities for 2001, 2003, and 2004. Petitioner has failed to present any evidence that would establish that his failure to pay was due to reasonable cause, and instead he has sought to rely on unreasonable and unsupportable arguments. Accordingly, petitioner is liable for the addition to tax under section 6651(a)(2) for 2001, 2003, and 2004.

VI.    Section 6654 Addition to Tax

Respondent determined that petitioner is liable for an addition to tax under section 6654(a) for failure to pay estimated income tax for 2001.

Section 6654(a), (b), and (c) imposes an addition to tax on an individual taxpayer who underpays at least one of four required installments of estimated tax. The addition to tax is calculated with reference to four installment payments each equal to 25% of the required annual payment. Sec. 6654(c)(1), (d)(1)(A). The "required annual payment" is the lesser of (1) 90% of the tax shown on the return for the taxable year (or, if no return is filed, 90% of the tax for such year), or (2) 100% of the tax shown on the taxpayer's return for the preceding taxable year. Sec. 6654(d)(1)(B). Option (2) does not apply where a taxpayer has not filed a return for the preceding taxable year. Id. cl. (ii).

The Commissioner has the burden of production with respect to the section 6654 addition to tax. Sec. 7491(c). To satisfy his burden of production under

**[\*50]** section 7491(c), the Commissioner must produce evidence establishing that the taxpayer had a "required annual payment" as defined in section 6654(d)(1)(B). Wheeler v. Commissioner, 127 T.C. at 211-212. This burden requires the Commissioner to produce evidence that allows the Court to determine the amount of the required annual payment. See sec. 6654(d)(1)(B)(i) and (ii); Wheeler v. Commissioner, 127 T.C. at 212. To determine the amount of petitioner's required annual payment for 2001, the Court must know whether petitioner filed a return for the preceding taxable year (2000) and, if so, the amount of "tax shown" on that return. See sec. 6654(d)(1)(B)(ii). Thus, the Commissioner must introduce evidence showing whether petitioner filed a return for 2000 and, if he did, the amount of "tax shown" on that return. See id.

On the basis of the record, the Court concludes that respondent has not met his burden of production. Therefore, petitioner is not liable for the section 6654(a) addition to tax for 2001.

The Court has considered all of the arguments made by the parties and to the extent they are not addressed herein, they are considered unnecessary, moot, irrelevant, or without merit.

**[*51]** To reflect the foregoing,

<u>An appropriate decision</u>

<u>will be entered</u>.