T.C. Memo. 2020-13

UNITED STATES TAX COURT

EDWARD ANTHONY PURVIS AND MAUREEN HELENA PURVIS,
Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18817-12.                    Filed January 15, 2020.

<u>Derek W. Kaczmarek</u>, for Edward Anthony Purvis.

<u>Derek W. Kaczmarek</u> and <u>David R. Jojola</u>, for Maureen Helena Purvis.

<u>Alicia E. Elliott</u> and <u>Derek S. Pratt</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ASHFORD, <u>Judge</u>:  By statutory notice of deficiency dated April 27, 2012,

respondent determined deficiencies in petitioners' Federal income tax and

[*2] civil fraud penalties pursuant to section 6663(a)[1] for the 2005, 2006, 2007, and 2008 taxable years (years at issue) as follows:

| Year | Deficiency | Penalty[1] sec. 6663(a) |
|------|-----------|------------------------|
| 2005 | $91,255 | $68,441 |
| 2006 | 320,183 | 240,137 |
| 2007 | 67,891 | 50,918 |
| 2008 | 6,941 | 5,206 |

[1]In the notice of deficiency respondent also determined that petitioners are liable for accuracy-related penalties under sec. 6662(a) if it is "determined that the underpayment of tax was not due to fraud."

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts are rounded to the nearest dollar.

[*3]    After concessions by the parties,[2] one issue remains for decision:  Whether petitioners are liable for civil fraud penalties, or in the alternative, accuracy-related penalties for the years at issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulation of facts, the supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference.  Petitioners resided in Arizona when they timely filed their petition with the Court.

---

[2]The parties agree that petitioners are liable for deficiencies in their Federal income tax as follows:

| Year | Deficiency |
|------|-----------|
| 2005 | $90,591 |
| 2006 | 173,312 |
| 2007 | 23,491 |
| 2008 | 6,941 |

The parties further agree that these deficiencies are based on petitioners' failure to report (1) taxable income from an entity called Nakami Chi Group Ministries International (NCGMI), as further discussed infra pp. 8-9, and (2) short-term capital gain from the sale of real property on West Dublin Lane in Chandler, Arizona (Dublin property), also as further discussed infra p. 4.  The parties also agree that Mrs. Purvis is not entitled to relief from joint and several liability for the deficiencies or penalties under sec. 6015(b), (c), or (f) for the years at issue.

**[*4]** I.     Background on Petitioners

Petitioners are college graduates.  Mrs. Purvis is a registered nurse.  Over the course of her nursing career she has held several roles at the executive and management level.  Mr. Purvis has also been trained as a nurse (a licensed practical nurse) and worked as a nurse for 18 years until 2000 when, as further discussed infra pp. 5-7, he began selling securities and investments.  The only professional license Mr. Purvis has held is his nursing license.

During the years at issue and continuing up to the time of trial petitioners were married and their primary residence was on West Shannon Street in Chandler, Arizona (Shannon residence).  In June 2005 Mr. Purvis purchased the Dublin property.  He later sold that property, realizing short-term capital gain of $88,467 in March 2006.

Petitioners maintained several personal bank accounts at Arizona Federal Credit Union (AZFCU) and Washington Mutual Bank (WaMu) during the years at issue.  At AZFCU petitioners maintained a joint account and Mr. Purvis maintained a separate account.  In 2007 and 2008 petitioners maintained a joint account[3] and each maintained a separate account at WaMu.  In 2005 and 2006 Mr.

---

[3]This account was initially opened in Mr. Purvis' name only but was changed to a joint account in both petitioners' names in March 2008.

**[*5]** Purvis also had signature authority over NCGMI's bank accounts, as further discussed infra p. 7.

Petitioners maintained several credit cards during the years at issue. During 2005 petitioners maintained three credit cards, during 2006 and 2007 they maintained six credit cards, and during 2008 they maintained two credit cards.

## II.     Petitioners' Involvement With NCGMI

### A.     Formation of NCGMI

Beginning in 2000 Mr. Purvis began soliciting investments from family and friends for bridge loans to companies. He did this through a company that he started called Southern Global. In 2002 he "put aside" Southern Global and became involved with NCGMI. NCGMI was organized under the laws of the State of Nevada as a corporation sole[4] by Gregg Wolfe, Mr. Purvis' longtime friend, on August 5, 2002. Before starting NCGMI, Mr. Wolfe had owned a roofing business; like Mr. Purvis, he had no prior experience in selling securities or investments. Although NCGMI's articles of incorporation identified Mr. Wolfe as the presiding managing director, he was second in command of NCGMI, behind

---

[4]The Internal Revenue Service (IRS) defines a corporation sole as a "corporate form authorized under certain state laws to enable bona fide religious leaders to hold property and conduct business for the benefit of a religious entity." Rev. Rul. 2004-27, 2004-1 C.B. 625, 626; see also Hovind v. Commissioner, T.C. Memo. 2012-281, at *7 n.11.

[*6] Mr. Purvis. NCGMI's bank accounts identified Mr. Purvis as the executive director or "scribe" of NCGMI.

NCGMI claimed to provide investment opportunities and ministry activities. In reality it was an affinity-based Ponzi scheme; investors' funds were used to pay returns to other investors and, as discussed infra pp. 8-9, to pay some of petitioners' personal expenses.

NCGMI's investment opportunities consisted of stock offerings and short-term bridge loans. The stock offerings involved the sale of nonpublicly traded stock in ACI Holdings, Inc. (ACI), a Nevada corporation. Mr. Purvis promoted the sale of ACI stock by representing to investors that the stock, which was then selling at 80 cents a share, would increase to $3 or $4 a share in 2005 or early 2006 when the company became publicly traded. The bridge loans involved the pooling of investor funds in various self-directed individual retirement accounts at two trust companies; Mr. Purvis, authorized to act as the account holders' agent or representative, would direct the funds to companies of his choosing. Mr. Purvis represented to investors that they would earn a monthly return of 2% on their investment or 24% annually. He then made loans to various companies in need of capital.

**[\*7]** Mr. Purvis offered these investment opportunities to individuals in and outside Arizona, including his and Mrs. Purvis' family and friends and individuals he met at churches. He advised some of their close friends to refinance their homes and invest the equity with NCGMI.[5] In order to assure investors that their investments would be secure, he misrepresented that he and Mrs. Purvis had sufficient wealth to personally guarantee the return on their investments in the event of a problem.

Beginning in April and ending September 2006 Mrs. Purvis took charge of the ministry side of NCGMI. As the ministry leader she managed two employees and led prayer meetings. The record reflects that NCGMI's ministry activities consisted of hosting only a few prayer meetings.

In 2004, 2005, and 2006 NCGMI maintained two bank accounts at Bank of America and a bank account at Wells Fargo Bank. During 2005 and 2006 Mr. Purvis had sole authority over and access to the Bank of America accounts and equal authority over and access to the Wells Fargo account with Mr. Wolfe.

---

[5]Although Mr. Purvis was the primary person who solicited investments from other people, Mr. Wolfe advised at least one investor to write "donation" on checks written to NCGMI that were intended to be bridge loan investments.

**[*8]** B.    Petitioners' Receipt of Income From NCGMI

Mrs. Purvis received a monthly paycheck of $2,500 from April to September 2006 as compensation for her work at NCGMI.  Mr. Purvis, however, never received a paycheck from NCGMI; instead, he would write himself checks, transfer money directly from NCGMI's bank accounts into their personal bank accounts, take cash from NCGMI's bank accounts, or have NCGMI directly pay some of their personal expenses.  Additionally, Mr. Purvis authorized and instructed Tracy Wyatt, his assistant at NCGMI, to pay some of his and Mrs. Purvis' personal bills, including their personal credit cards.

Payments made by NCGMI of petitioners' personal expenses during the years at issue include payments of their mortgages on the Dublin property and the Shannon residence, a car loan and car insurance, and personal credit cards. NCGMI funds were also used to purchase jewelry for Mrs. Purvis and a Toyota truck and for a downpayment on a new home that petitioners sought to buy.[6]  In

---

[6]In 2005 NCGMI's payments and purchases on behalf of or for the benefit of petitioners included mortgage payments totaling $25,514, car insurance payments totaling $6,567, credit card payments totaling $113,263, the purchase of jewelry totaling $12,925 and a Toyota truck for $30,920, and the payoff of $11,135 on a car loan on a Dodge Durango.  In 2006 NCGMI's payments on behalf of or for the benefit of petitioners included mortgage payments totaling $41,578, credit card payments totaling $200,498, and a nonrefundable deposit on a new home totaling $50,000.

[*9] 2005 and 2006 Mr. Purvis withdrew cash from NCGMI's bank accounts totaling $207,508 and $251,775, respectively. Sometime in 2006 Mrs. Purvis knew that NCGMI was paying their personal expenses.

Beginning in 2007 NCGMI's bank accounts were closed or no longer in use. Mr. Purvis, however, continued to solicit investments on behalf of NCGMI during 2007 and 2008. Instead of depositing investors' funds into NCGMI's bank accounts, he would deposit them directly into petitioners' personal bank accounts. During 2007 Mr. Purvis deposited checks totaling $59,575 and cash totaling $24,759 to their personal bank accounts from NCGMI investors; these accounts also received wire transfers totaling $54,421 from NCGMI investors. During 2008 Mr. Purvis deposited checks totaling $35,531 and cash totaling $10,780 to their personal bank accounts from NCGMI investors; these accounts also received wire transfers totaling $43,500 from NCGMI investors.

III. Investigations and Criminal Activity

Beginning in 2005 NCGMI, Mr. Purvis, Mr. Wolfe, and other business associates of Mr. Purvis and Mr. Wolfe were investigated by the Securities Division of the Arizona Corporation Commission (ACC) for violations of the Securities Act of Arizona (Securities Act) (ACC investigation). A complaint from a concerned person in early 2005 triggered the ACC investigation.

**[*10]** In connection with the ACC investigation, on or about June 10, 2005, the ACC issued a subpoena to Mr. Purvis, requesting that on June 21, 2005, he produce documents and give testimony regarding his activities with respect to NCGMI. The subpoena requested that for the period beginning July 1, 2003, to June 21, 2005, he produce all documents, records, books, and any other papers, whether stored on electronic media or otherwise, incident or relating to himself, Mr. Wolfe, ACI, and NCGMI (to name a few). The subpoena further prescribed that the documents and records include but not be limited to (1) all documents or records related to any solicitation made by or on behalf of himself, Mr. Wolfe, ACI, and NCGMI (to name a few), (2) the contact information of all individuals or entities which had been offered or sold investments by himself, Mr. Wolfe, ACI, or NCGMI (to name a few), (3) the amounts and dates of investments for each of those individuals and entities, (4) all lists of prospective investors, and (5) all contracts or agreements, records of payments, or communications, either written or electronic, between himself, Mr. Wolfe, ACI, and NCGMI (to name a few).

Mr. Purvis retained an attorney, Alan Baskin, to represent him before the ACC. Mr. Baskin was able to negotiate an extension of time until August 2005 to comply with the subpoena. In August 2005 Mr. Baskin ceased representing Mr.

[*11] Purvis when it became clear that he was not planning on complying with the subpoena despite Mr. Baskin's advice to the contrary.

The ACC issued a second subpoena to Mr. Purvis on September 7, 2005, requesting that on September 20, 2005, he produce the documents previously requested in the June 10, 2005, subpoena. Upon Mr. Purvis' failure to comply with either subpoena, on or about March 8, 2006, the ACC filed a complaint in the Superior Court of Arizona in Maricopa County, Arizona (Maricopa County court), against Mr. Purvis, seeking to enforce the subpoenas (subpoena enforcement action). Mr. Purvis retained another attorney, John Masten O'Neal, to represent him in the subpoena enforcement action, but by letter to the ACC dated June 26, 2006, Mr. Purvis stated that he did not have any of the requested documents or records. On June 27, 2006, the Maricopa County court ordered Mr. Purvis to comply with the subpoenas. Mr. Purvis, however, failed to abide by the order.

On July 26, 2006, the ACC requested that the Maricopa County court issue an order to show cause why Mr. Purvis should not be held in contempt for violating the court's June 27, 2006, order. On September 21, 2006, Mr. Purvis, through Mr. O'Neal, filed a motion to vacate a hearing with respect to the subpoena enforcement case on the basis that he had no documents or records to produce. On February 12, 2007, after an evidentiary hearing regarding whether

[*12] Mr. Purvis should be found in contempt, Mr. Purvis filed a posthearing brief, arguing that he "presented compelling evidence demonstrating that he does not possess nor control any documents responsive to the ACC's subpoena." Mr. Purvis never produced any of the requested documents or records.

Meanwhile, beginning approximately one month after the ACC requested that the Maricopa County court issue the show cause order and in an effort to disrupt the ACC investigation against him by creating conflicts of interest, Mr. Purvis began instituting frivolous claims and lawsuits. On July 7, 2006, Mr. Purvis sent a document titled "Notice of International Commercial Claim Within The Admiralty ab initio Administrative Remedy" to, among others, the attorneys and the investigators handling the ACC investigation, the judge presiding over the subpoena enforcement action, and a journalist from the Arizona Republic reporting on the ACC investigation as "libelees" (July admiralty claim). The July admiralty claim was meant to serve as a "self-executing contract" in which the libelees agreed that the ACC investigation against Mr. Purvis was nothing more than a "witch-hunt, and, or a fishing expedition". The July admiralty claim asserted that as a result of the libelees' "future acts" and Mr. Purvis' "resulting loss of freedom or standing in the community among * * * [his] friends, peers, colleagues, customers, and prospective customers", they would owe Mr. Purvis at

**[\*13]** least $15 million in damages "per act", "for each occurrence in the future", or "for entering or causing the entry of any negative or derogatory information * * * [against Mr. Purvis] in the public record." Then on August 23, 2006, Mr. Purvis filed a document titled "Conditional Acceptance" with the Maricopa County court against the attorneys and the investigators handling the ACC investigation (August admiralty claim). In October 2006 Mr. O'Neal recommended to Mr. Purvis that he withdraw the July and August admiralty claims because they were unwarranted and frivolous, but he refused.

On October 3, 2006, the ACC filed an administrative complaint against petitioners, Mr. Wolfe and his wife, NCGMI, ACI, and two other individuals,[7] alleging multiple violations of the Securities Act (securities action). Mr. O'Neal also represented petitioners in this action.

On November 13, 2006, Mrs. Purvis (and other unnamed individuals) met with an individual named Markham Daly in Colorado to discuss strategies regarding the July and August admiralty claims; how to file a "libel of review" action, including serving the judge presiding over the subpoena enforcement action in open court; and the possibility that the July and August admiralty claims

---

[7]The two other individuals were James Keaton, the president, treasurer, director, and majority shareholder of ACI, and his wife.

**[*14]** and the possible libel of review action would cause the securities action to be dismissed.

On November 16, 2006, Mr. Purvis filed Uniform Commercial Code (UCC) financing statements with the secretary of state for the State of Colorado against the same parties named in the July admiralty claim. He then the next day filed a document titled "Commercial Notice of Lien" in the U.S. District Court for the District of Colorado and a document titled "Verified Petition for Libel of Review" in the U.S. District Court for the District of Arizona also against the same parties named in the July admiralty claim.[8]

On December 21, 2006, Mr. Purvis filed an involuntary bankruptcy petition against the same Arizona Republic journalist named in the July admiralty claim (and the November 16, 2006, filings) in an attempt to negate what the newspaper articles had reported about him.

While the securities action was pending, on April 19, 2007, Mr. Purvis was indicted by a grand jury of the Maricopa County court on one count of bribery of a public servant (a "Class 4" felony) and four counts of harassment of a public officer or employee ("Class 5" felonies). These charges resulted from Mr. Purvis'

---

[8]The U.S. District Court for Arizona dismissed with prejudice the action Mr. Purvis commenced in its court. The record is silent as to the disposition of the action he filed in the U.S. District Court for Colorado.

[*15] activities from January 2005 through April 2007 involving (1) Mr. Purvis' friend, Chandler, Arizona, police department detective Bradley Forward, who retrieved confidential criminal history and other personal information on several individuals involved with the ACC investigation for Mr. Purvis and (2) the filing of the July and August admiralty claims against the judge presiding over the subpoena enforcement action and the individuals at the ACC handling the ACC investigation. After a jury trial, on May 1, 2008, Mr. Purvis was convicted on all counts in the indictment. On May 29, 2008, he was sentenced to concurrent terms of 1½ years' imprisonment for each of the harassment counts and 3 years' probation from the date of discharge from the Arizona Department of Corrections and an $18,000 fine for the bribery count. His conviction and sentence were affirmed on appeal by the Arizona Court of Appeals.

Meanwhile, the hearing for the securities action began November 13, 2007, and spanned 15 days over November and December 2007 and January 2008. In an opinion and order dated December 22, 2008, the ACC concluded that Mr. Purvis' actions and conduct as described therein constituted multiple violations of the Securities Act and were grounds for an order of restitution and an order assessing administrative penalties. In the opinion and order the ACC ordered Mr. Purvis to cease and desist from his actions and ordered petitioners to pay administrative

[*16] penalties totaling $250,000 and restitution in an amount not to exceed $11,044,912. The ACC's opinion and order was recorded with the Maricopa County court as a judgment against petitioners on January 8, 2009.[9]

On January 14, 2009, Mr. Purvis was indicted by a grand jury of the Maricopa County court on 1 count of fraudulent schemes and artifices (a "Class 2" felony), 1 count of illegal control of an enterprise (a "Class 3" felony), 21 counts of theft ("Class 2", "Class 3", and "Class 4" felonies), 21 counts of securities fraud ("Class 4" felonies), 21 counts of sale of unregistered securities ("Class 4" felonies), and 21 counts of transactions by unregistered dealers or salesmen ("Class 3" felonies). If convicted on all counts in the indictment, he was facing a possible sentence of 108 years' imprisonment. In 2012 Mr. Purvis pleaded guilty to two counts in the indictment: fraudulent schemes and artifices and illegal control of an enterprise. As part of Mr. Purvis' plea agreement, the Arizona Attorney General's Office agreed to not prosecute Mrs. Purvis for any role she may have had in the crimes charged in the indictment. Also as part of the plea agreement, the Arizona Attorney General's Office agreed to not file additional

---

[9]The Maricopa County court and the Arizona Court of Appeals affirmed the ACC's opinion and order except that the Arizona Court of Appeals reduced the amount of restitution to not exceed $8,174,534 (i.e., the amount of receipts investors deposited with NCGMI).

[*17] securities law violation charges, fraudulent schemes and artifices charges, money laundering charges, or criminal enterprise charges against Mrs. Purvis. On March 2, 2012, Mr. Purvis was sentenced to five years' imprisonment plus probation for seven years and ordered to pay restitution of not less than $3,818,923.

## IV.   Petitioners' Joint Federal Income Tax Returns

In 2008 and 2009 the IRS sent petitioners multiple letters regarding their unfiled Federal income tax returns for 2005 and 2006, but as of January 2009 petitioners had not filed their returns for any of the years at issue.[10] Seeking to resolve their filing obligations and while Mr. Purvis was incarcerated, Mrs. Purvis hired James Schmidt, a certified public accountant (C.P.A.) and a longtime partner at an Arizona business advisory and C.P.A. firm, to prepare their returns for the years at issue. Pursuant to the letter she signed engaging Mr. Schmidt's firm, Mrs. Purvis was responsible for providing "all the information required for the preparation of complete and accurate returns." Additionally, according to the engagement letter, she had "the final responsibility for income tax returns and, therefore, * * * should review them carefully before * * * sign[ing] them."

---

[10]We note that as of January 2009 petitioners' return for 2008 was not delinquent.

**[*18]** Mrs. Purvis provided Mr. Schmidt a copy of petitioners' filed joint Federal income tax return for 2004 (2004 return) to use as a template for filing the returns for the years at issue. This return did not report any income from NCGMI but reported, inter alia, a business loss from "consulting" activities of Mr. Purvis as reflected on an attached Schedule C, Profit or Loss From Business.

With respect to the 2005 and 2006 returns, Mrs. Purvis provided Mr. Schmidt with extensive information regarding deductions to be claimed on these returns including, as discussed below, Forms 1098, Mortgage Interest Statement, Forms 1098-T, Tuition Statement, receipts for cash contributions to various charitable and religious organizations, and medical expenses. Mrs. Purvis informed Mr. Schmidt that she had no information pertaining to the 2006 sale of the Dublin property except that the property was solely owned by Mr. Purvis as an agent for NCGMI and purchased with NCGMI funds.

With respect to the 2005 return, Mrs. Purvis provided Mr. Schmidt a Form W-2, Wage and Tax Statement, that CPS, Inc. (CPS), issued to her, two Forms 1099-INT, Interest Income, that AZFCU issued to petitioners (one to Mr. Purvis and the other to her), a Form 1098-T that Arizona State University issued to one of petitioners' children, three Forms 1098 that Chase Home Finance, LLC, issued to her with respect to the Shannon residence, two Forms 1098 that Countrywide

[*19] Bank (Countrywide)[11] issued to her with respect to the Shannon residence, a Form 1098 that Countrywide issued to Mr. Purvis with respect to the Dublin property, Maricopa County property tax information pertaining to the Shannon residence, and receipts for cash contributions to several charitable and religious organizations.

With respect to the 2006 return, Mrs. Purvis provided Mr. Schmidt a Form W-2 that CPS issued to her, two Forms 1099-INT that AZFCU issued to petitioners (one to Mr. Purvis and the other to Mrs. Purvis), a Form 1099-INT that Pinnacle 1031 Exchange Co. issued to Mr. Purvis, two Forms 1098 that Countrywide issued to her with respect to the Shannon residence, a Form 1098 that Countrywide issued to Mr. Purvis with respect to the Dublin property, two Forms 1098-T that Arizona State University issued to one of their children, an itemized list of medical expenses paid, and receipts for cash contributions to two religious organizations.

With respect to the 2007 return, Mrs. Purvis provided Mr. Schmidt a Form W-2 that CPS issued to her, two Forms 1099-INT that AZFCU issued to petitioners (one to Mr. Purvis and the other to Mrs. Purvis), Maricopa County

---

[11]Some of these Forms 1098 were issued by Countrywide Home Loans. For convenience we will refer to both Countrywide Bank and Countrywide Home Loans as Countrywide.

[*20] property tax information pertaining to the Shannon residence, and receipts for cash contributions to two religious organizations.

With respect to the 2008 return, Mrs. Purvis provided Mr. Schmidt a Form W-2 that CPS issued to her, a Form 1099-INT that AZFCU issued to her, a "Schedule C Summary" of income and expenses related to her activities as a nurse at Springdale West and Chris Ridge Premier Care & Rehab, a Form 1099-MISC, Miscellaneous Income, that Springdale West issued to her, a Form 1099-MISC that Chris Ridge Premier Care & Rehab issued to her, two Forms 1098 that Countrywide issued to her with respect to the Shannon residence, a Form 1098-T that Arizona State University issued to one of petitioners' children, two Forms 1098-E, Student Loan Interest Statement, that Sallie Mae and American Education Services issued to one of petitioners' children, receipts for dental expenses paid, and Maricopa County property tax and valuation information pertaining to the Shannon residence.

Although in preparing all of the returns Mr. Schmidt was aware of the existence of NCGMI and the securities action, Mrs. Purvis never told him that NCGMI had actually made some of the charitable contributions and paid some of petitioners' personal expenses, including mortgage payments. Neither did she disclose that from April to September 2006 she had received a monthly paycheck

[*21] of $2,500 from NCGMI and that Mr. Purvis had received payments from NCGMI. Instead, she told Mr. Schmidt that all information needed to calculate Mr. Purvis' income for the years at issue had been seized by the ACC when in fact the only documents seized were for 2005 and 2006. Thus, when petitioners signed and filed the returns for the years at issue, they knew that the returns omitted all the income from NCGMI and claimed certain deductions for amounts that were paid by NCGMI, including charitable contributions and mortgage interest for the Dublin property and the Shannon residence.

Petitioners' 2005, 2006, and 2007 returns were filed late, on February 16, March 30, and July 27, 2009, respectively. Petitioners' 2008 return was timely filed (on extension), on July 27, 2009. Petitioners never attempted to prepare amended returns for any of the years at issue.

Petitioners' 2005 return reported total income of $110,362, consisting of "[w]ages, salaries, tips, etc." of $110,268 (i.e., Mrs. Purvis' total wages from CPS) and taxable interest of $94. The return claimed a deduction for tuition and fees paid of $4,000 and itemized deductions of $44,040, consisting of the following: (1) medical and dental expenses of $1,023 (after the application of the 7.5% floor imposed by section 213(a)), (2) taxes paid totaling $4,532, (3) mortgage interest paid of $25,081, (4) cash charitable contributions of $9,321, and (5) unreimbursed

**[*22]** employee business expenses of $4,083 (after the application of the 2% floor imposed by section 67(a)). The return also reported four exemptions (one each for petitioners and one each for their two children) and payments (Federal income tax withheld and the refund amount applied from the 2004 return) totaling $12,514. Finally, the 2005 return reported a resulting refund of $5,815 (which they directed to be applied to their 2006 estimated tax).

Petitioners' 2006 return reported total income of $49,522, consisting of "[w]ages, salaries, tips, etc." of $49,048 (i.e., Mrs. Purvis' total wages from CPS) and taxable interest of $474. The return claimed a deduction for tuition and fees paid of $4,000 and itemized deductions of $67,479, consisting of the following: (1) medical and dental expenses of $10,284 (after the application of the 7.5% floor imposed by section 213(a)), (2) taxes paid totaling $3,819, (3) mortgage interest paid of $31,882, (4) cash charitable contributions of $21,054, and (5) unreimbursed employee business expenses of $440 (after the application of the 2% floor imposed by section 67(a)). The return also reported four exemptions (one each for petitioners and one each for their two children) and payments (Federal income tax withheld, the refund amount applied from the 2005 return, and certain credits) totaling $6,703. Finally, the 2006 return reported a resulting refund of $6,703 (which they directed to be applied to their 2007 estimated tax).

[*23] Petitioners' 2007 return reported total income of $2,668, consisting of "[w]ages, salaries, tips, etc." of $2,540 (i.e., Mrs. Purvis' total wages from CPS) and taxable interest of $128. The return claimed the standard deduction of $10,700 and reported four exemptions (one each for petitioners and one each for their two children) and payments (Federal income tax withheld, the refund amount applied from the 2006 return, and certain credits) totaling $7,003. Finally, the 2007 return reported a resulting refund of $7,003 (which they directed to be applied to their 2008 estimated tax).

Petitioners' 2008 return reported total income of $35,572, consisting of "[w]ages, salaries, tips, etc." of $1,640 (i.e., Mrs. Purvis' total wages from CPS), taxable interest of $21, and business income of $33,911 (i.e., Mrs. Purvis' nursing activities with Springdale West and Chris Ridge Premier Care & Rehab as reflected on an attached Schedule C). The return claimed deductions for one-half of self-employment tax of $2,396, self-employed health insurance of $7,000, tuition and fees paid of $4,000, and itemized deductions of $42,353, consisting of the following: (1) taxes paid totaling $3,298, (2) mortgage interest paid of $27,967, and (3) cash charitable contributions totaling $11,088.[12] The return also

_____

[12]The total amount of cash charitable contributions includes an amount carried over from the prior year.

[*24] reported four exemptions (one each for petitioners and one each for their two children) and payments (Federal income tax withheld and the refund amount applied from the 2007 return) totaling $7,618. Finally, the 2008 return reported a resulting refund of $2,826 (which they directed to be applied to their 2009 estimated tax).

## V. Audit and Determination

In or around June 2010 the IRS selected petitioners' returns for the years at issue for audit. The audit was conducted by IRS Revenue Agent Almiria Garcia (RA Garcia). She met with Mrs. Purvis in petitioners' residence for an initial audit interview. Up until approximately January 2012 RA Garcia spoke via telephone and corresponded with petitioners, and they executed in September or October 2011 a Form 872, Consent to Extend the Time to Assess Tax, extending the time for the IRS to assess tax for 2005 and 2006.[13] RA Garcia, however, summoned NCGMI's bank account records, which she used to reconstruct petitioners' income for 2005 and 2006. She also identified items that were disbursed for the benefit of petitioners. She determined, and petitioners now agree, see supra note 2, that

---

[13]The record is silent as to the length of the extension. However, according to RA Garcia's case activity record, on February 28, 2012, she prepared additional Forms 872 (for all of the years at issue) for petitioners' signatures; she was never able to secure their signatures for these forms.

[*25] certain disbursements from NCGMI's bank accounts were for petitioners' benefit and constitute taxable income to them. Specifically, she determined and petitioners now agree that petitioners did not report taxable income from NCGMI of $273,514 for 2005, $485,313 for 2006, $143,432 for 2007, and $89,811 for 2008. Additionally, RA Garcia summoned petitioners' personal bank account records, which she used to reconstruct their income for 2007 and 2008.

RA Garcia also determined during the course of the audit that section 6663(a) fraud penalties were warranted. The record includes a completed Civil Penalty Approval Form for section 6663(a) fraud penalties asserted as the primary position and section 6662(a) accuracy-related penalties asserted in the alternative for the years at issue. The form includes a signature on the line provided on the form for "Group Manager Approval to Assess Penalties Identified Above" dated March 14, 2012, five days before the date of the Form 4549-A, Income Tax Discrepancy Adjustments, reflecting the proposed changes to petitioners' Federal income tax for the years at issue, including the imposition of section 6663 fraud penalties and section 6662(a) accuracy-related penalties; the Form 4549-A is attached to the April 27, 2012, notice of deficiency to petitioners.[14]

---

[14]We consider the Form 4549-A to be part of the April 27, 2012, notice of deficiency. See Whitesell v. Commissioner, T.C. Memo. 2019-126, at *8.

(continued...)

**[*26]**                                    OPINION

Section 6663(a) provides that "[i]f any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud." The section 6663(a) fraud penalty is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. See Helvering v. Mitchell, 303 U.S. 391, 401 (1938); Sadler v. Commissioner, 113 T.C. 99, 102 (1999).

The Commissioner has the burden of proving fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b). To do so, the Commissioner must prove for each relevant year that (1) an underpayment of tax exists and (2) the underpayment was due to fraud.[15] See Sadler v. Commissioner, 113 T.C. at 102;

---

[14](...continued)
Additionally, as explained infra pp. 28-32, we are reopening the record to admit the Civil Penalty Approval Form and a declaration of IRS Supervisory Internal Revenue Agent Tim Salsberry insofar as it authenticates the Civil Penalty Approval Form for purposes of Fed. R. Evid. 902(11).

[15]Additionally, in the case of a joint return, the sec. 6663 penalty "shall not apply with respect to a spouse unless some part of the underpayment is due to the fraud of such spouse." Sec. 6663(c); see also Stone v. Commissioner, 56 T.C. 213, 227 (1971).

**[\*27]** <u>Katz v. Commissioner</u>, 90 T.C. 1130, 1143 (1988). The latter burden is met if it is shown that the taxpayer intended to conceal, mislead, or otherwise evade the collection of taxes known or believed to be owing. <u>Katz v. Commissioner</u>, 90 T.C. at 1143 (and cases cited thereat). If the Commissioner establishes that any portion of the underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud and subjected to a 75% penalty, unless the taxpayer establishes by a preponderance of the evidence that some part of the underpayment is not attributable to fraud. Sec. 6663(b).

In <u>Frost v. Commissioner</u>, 154 T.C. __, __ (slip op. at 20) (Jan. 7, 2020), we recently held that the Commissioner bears the initial burden of production under section 7491(c) to offer evidence that he has complied with the procedural requirements of section 6751(b) and that once he has satisfied this initial burden the taxpayer must come forward with contrary evidence. We address the burden of production issue first.

I.      Section 6751(b) Compliance

Section 6751(b)(1) requires the initial determination of certain penalties be "personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate." See <u>Graev v. Commissioner</u> (<u>Graev III</u>), 149 T.C. 485, 492-493

[*28] (2017), supplementing and overruling in part Graev v. Commissioner (Graev II), 147 T.C. 460 (2016); see also Clay v. Commissioner, 152 T.C. 223, 249 (2019) (citing section 6751(b)).  In Belair Woods, LLC v. Commissioner, 154 T.C. __, __ (slip op. at 24-25) (Jan. 6, 2020), we recently held that "the 'initial determination' of a penalty assessment * * * is embodied in the document by which the Examination Division formally notifies the taxpayer, in writing, that it has completed its work and made an unequivocal decision to assert penalties."

Trial of this case was held, and the record was closed, before we issued Graev III and overruled in part Graev II (and issued Clay).  In the light of Graev III, we ordered respondent to file a response addressing the effect of section 6751(b) on this case and directing the Court to any evidence of section 6751(b) supervisory approval in the record and petitioners to respond.  Respondent asserts that there is such evidence in the record:  (1) the testimony of RA Garcia that she received the required approvals in writing and (2) Exhibit 95-R, which is her case activity record signed by Mr. Salsberry, her immediate supervisor, when the case was being closed to prepare the notice of deficiency and "includes references to the civil fraud penalties and the agent's workpapers that detail the reasons for asserting the penalties."  Nevertheless, respondent filed a motion to reopen the record to offer into evidence (1) the declaration of Mr. Salsberry and (2) the Civil

**[\*29]** Penalty Approval Form for the years at issue, dated before the issuance of the notice of deficiency (and before the Form 4549-A, which was attached thereto) and signed by Mr. Salsberry. Petitioners objected to the introduction of any additional evidence with respect to the penalties and requested that the Court deny respondent's motion.

As an initial matter, we conclude that RA Garcia's testimony and her case activity record are insufficient to satisfy respondent's initial burden of production that he complied with section 6751(b)(1). RA Garcia's testimony provided no details regarding the required approval for the penalties here. She did not identify the date when supervisory penalty approval was secured, nor did she identify who gave the approval; indeed, her testimony relating to penalty approval was more about the penalty approval procedures generally. Similarly, her case activity record is vague as to penalty approval; it does not outline which penalties should be imposed, nor does it indicate supervisory penalty approval was secured (let alone on a particular date). It is apparent that Mr. Salsberry's signature on the case activity record dated March 14, 2012, which is immediately below the lines for "Case Closed" (and RA Garcia's signature dated March 13, 2012), reflects just that and nothing more--that the audit of petitioners' returns for the years at issue was closed.

[*30] We now turn to the propriety of respondent's motion to reopen the record. Reopening the record for the submission of additional evidence lies within the Court's discretion. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331 (1971); Butler v. Commissioner, 114 T.C. 276, 286-287 (2000); see also Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 363 (9th Cir. 1974) ("[T]he Tax Court's ruling [denying a motion to reopen the record] is not subject to review except upon a demonstration of extraordinary circumstances which reveal a clear abuse of discretion."), aff'g T.C. Memo. 1971-200. We will not grant a motion to reopen the record unless, among other requirements, the evidence relied on is not merely cumulative or impeaching, is material to the issues involved, and probably would change some aspect of the outcome of the case. Butler v. Commissioner, 114 T.C. at 287; see also SEC v. Rogers, 790 F.2d 1450, 1460 (9th Cir. 1986) (explaining that the trial court "should take into account, in considering a motion to hold open the trial record, the character of the additional * * * [evidence] and the effect of granting the motion"), overruled on other grounds by Pinter v. Dahl, 486 U.S. 622 (1988).

In reviewing motions to reopen the record, courts have considered when the moving party knew that a fact was disputed, whether the evidentiary issue was foreseeable, and whether the moving party had reason for the failure to produce

**[*31]** the evidence earlier. See, e.g., George v. Commissioner, 844 F.2d 225, 229-230 (5th Cir. 1988) (and cases cited threat) (holding that refusal to reopen the case was not an abuse of discretion because the issue was foreseeable to the taxpayers and the court could see no excuse for the taxpayers' failure to produce evidence earlier), aff'g Frink v. Commissioner, T.C. Memo. 1984-669. We also balance the moving party's diligence against the possible prejudice to the nonmoving party. In particular we consider whether reopening the record after trial would prevent the nonmoving party from examining and questioning the evidence as it would have during the proceeding. See, e.g., Estate of Freedman v. Commissioner, T.C. Memo. 2007-61; Megibow v. Commissioner, T.C. Memo. 2004-41.

The evidence that is the subject of respondent's motion would not be cumulative of any evidence in the record and it would not be impeaching material. Respondent bears the burden of production with respect to penalties and would offer the evidence as proof that the requirements of section 6751(b)(1) have been met. The subject evidence is material to the sole issue remaining in the case, and the outcome of the case will be changed if we grant respondent's motion.

Petitioners argue that respondent failed to exercise due diligence when respondent's counsel failed to submit proof of written supervisory approval before

[*32] trial.  When this case was submitted and the record closed, Graev III (as well

as Clay) had not been issued.  We agree with respondent that the Civil Penalty

Approval Form is not cumulative and is material to the sole issue remaining in this

case.  We also agree with respondent that the Civil Penalty Approval Form is a

record kept in the ordinary course of a business activity and is authenticated by the

declaration of Mr. Salsberry.  See Fed. R. Evid. 803(6), 902(11).  We will admit

the Civil Penalty Approval Form into evidence and the declaration for purposes of

authentication under rule 902(11) of the Federal Rules of Evidence.  See Clough v.

Commissioner, 119 T.C. 183, 190-191 (2002).

We now must decide whether respondent's evidence showing that certain

penalties were approved before a formal communication of the penalties to

petitioners is sufficient to satisfy his initial burden of production.  See Frost v.

Commissioner, 154 T.C. at __ (slip op. at 21).  The record indicates that the

April 27, 2012, notice of deficiency formally communicated assertion of the

penalties to petitioners.  We also know that the Civil Penalty Approval Form was

signed by Mr. Salsberry on March 14, 2012, approximately six weeks before the

April 27, 2012, notice of deficiency (and five days before the date of the Form

4549-A, which was attached to the notice of deficiency).  Consequently, we hold

that respondent has introduced evidence that written supervisory approval of the

[*33] penalties was given before a formal communication of the penalties to petitioners and that the evidence is sufficient to carry his initial burden of production under section 7491(c) to show that he complied with the procedural requirements of section 6751(b).

The burden now shifts to petitioners to offer evidence suggesting that written supervisory approval of the penalties was untimely--e.g., that there was a formal communication of the penalties before the proffered approval. See Frost v. Commissioner, 154 T.C. at __ (slip op. at 22). Petitioners have not claimed, nor does the record support a conclusion, that respondent formally communicated his initial penalty determination to petitioners before March 14, 2012--the date that Mr. Salsberry signed the Civil Penalty Approval Form. We therefore hold that the penalties here were approved in writing before the first formal communication to petitioners of those penalties. See id. at __ (slip op. at 23) (citing Clay v. Commissioner, 152 T.C. at 249).

## II.    Section 6663(a) Fraud Penalties

We now address whether petitioners are liable for section 6663(a) fraud penalties for the years at issue.

**[*34]** A.     Underpayment

Petitioners concede that they understated their Federal income tax liabilities

for the years at issue and that the understatements were attributable to their failure

to report significant amounts of taxable income from NCGMI and from the sale of

the Dublin property in 2006.  Consequently, petitioners underpaid their Federal

income tax liabilities for the years at issue.  Accordingly, respondent has proven

by clear and convincing evidence that petitioners underpaid their tax liabilities for

the years at issue.

B.     Fraudulent Intent

Next, we must determine whether respondent has proven by clear and

convincing evidence that any portion of the underpayments is attributable to fraud.

As indicated supra p. 27, fraud for this purpose is defined as intentional

wrongdoing by the taxpayer motivated by a specific purpose of avoiding tax

believed to be owing.  Maciel v. Commissioner, 489 F.3d 1018, 1026 (9th Cir.

2007), aff'g in part, rev'g in part T.C. Memo. 2004-28; Neely v. Commissioner,

116 T.C. 79, 86 (2001).  Fraud "does not include negligence, carelessness,

misunderstanding or unintentional understatement of income", but does include

any conduct designed to conceal, mislead, or otherwise prevent the collection of

taxes.  United Stated v. Pechenik, 236 F.2d 844, 846 (3d Cir. 1956); see Holland

**[*35]** v. United States, 348 U.S. 121, 139 (1954); United States v. Murdock, 290 U.S. 389, 396 (1933); DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. See DiLeo v. Commissioner, 96 T.C. at 874. Fraud will never be presumed and must be established by independent evidence of fraudulent intent. Recklitis v. Commissioner, 91 T.C. 874, 909-910 (1988). However, because direct proof of a taxpayer's fraudulent intent is rarely available, fraud may be established by circumstantial evidence and inferences drawn from the facts. Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992). The taxpayer's entire course of conduct during each relevant year and leading up to the preparation of the year's return may establish the requisite intent. DiLeo v. Commissioner, 96 T.C. at 874; Stone v. Commissioner, 56 T.C. 213, 224 (1971).

Fraudulent intent may be inferred from various kinds of circumstantial evidence or "badges of fraud". Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), aff'g T.C. Memo. 1984-601. To this end, courts have routinely considered whether the following badges of fraud are present: (1) a pattern of understating income, (2) failing to maintain adequate records, (3) offering implausible or inconsistent explanations of behavior, (4) concealing income or

[*36] assets, (5) dealing in cash, (6) providing incomplete or misleading information to his or her tax return preparer, (7) filing false documents, including filing false Federal income tax returns, (8) failing to file Federal income tax returns, (9) failing to cooperate with tax authorities, and (10) engaging in and attempting to conceal illegal activity. See id. at 307-308; Niedringhaus v. Commissioner, 99 T.C. at 211. The existence of any one factor is not dispositive but the existence of several factors is persuasive circumstantial evidence of fraud. See Niedringhaus v. Commissioner, 99 T.C. at 211; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989).

In the light of the foregoing, we will evaluate petitioners' conduct beginning in 2005 and continuing up to July 2009, when they filed their returns for 2007 and 2008.

### 1. Pattern of Understating Income

"A pattern of substantially underreporting income for several years is strong evidence of fraud, particularly if the understatements are not due to innocent mistake or are not otherwise satisfactorily explained." Green v. Commissioner, T.C. Memo. 2016-67, at *36 (and cases cited threat). Payments received from a closely held or controlled business entity and used for a taxpayer's personal expenses are income to the taxpayer, and the failure to report that income is

**[\*37]** evidence of fraud.  See Evans v. Commissioner, T.C. Memo. 2010-199, slip op. at 13, aff'd, 507 F. App'x 645 (9th Cir. 2013).  Additionally, discrepancies of 100% or more between the correct income and the reported income for several successive years is strong evidence of fraudulent intent.  Rogers v. Commissioner, 111 F.2d 987, 989 (6th Cir. 1940), aff'g 38 B.T.A 16 (1938); Cooley v. Commissioner, T.C. Memo. 2004-49, slip op. at 20.

On their 2005 return petitioners reported gross income of $110,362; on their 2006 return they reported gross income of $49,522; on their 2007 return they reported gross income of $2,668; and on their 2008 return they reported gross income of $35,572.  However, it is undisputed that petitioners received and failed to report taxable income from NCGMI of $273,514 for 2005, $485,313 for 2006, $143,432 for 2007, and $89,811 for 2008, and that they received and failed to report a short-term capital gain of $88,467 from the sale of the Dublin property in 2006.  Thus, petitioners' correct gross income for 2005, 2006, 2007, and 2008 was $383,876, $623,302, $146,100, and $125,383, respectively.  The discrepancies are 248% for 2005, 1159% for 2006, 5376% for 2007, and 252% for 2008.  In other words, petitioners' unreported income from NCGMI for 2005, 2006, 2007, and 2008 alone represented 71%, 78%, 98%, and 72%, respectively, of their correct gross income for those years.  Yet for those years petitioners claimed deductions

[*38] for items that were paid by NCGMI. These discrepancies are not innocent mistakes or otherwise satisfactorily explained. We find that petitioners' underreporting is both consistent and substantial and is a strong indicator of fraud for the years at issue.

### 2. Failing To Maintain Adequate Records

The failure to maintain adequate records supports a finding of fraud. See Truesdell v. Commissioner, 89 T.C. 1280, 1302-1303 (1987). Because petitioners did not maintain accurate books and records during the years at issue, RA Garcia had to resort to a bank deposits analysis to determine their income using their personal and NCGMI's bank account records. Accordingly, we find this factor favors a finding of fraud for the years at issue.

### 3. Implausible or Inconsistent Explanations of Behavior

A taxpayer's implausible or inconsistent explanations for his or her actions may constitute circumstantial evidence of fraudulent intent. See Bradford v. Commissioner, 796 F.2d at 307-308; Bahoric v. Commissioner, 363 F.2d 151, 153 (9th Cir. 1966).

Petitioners claim that they did not disclose NCGMI information to Mr. Schmidt under the advice of the attorneys who represented Mr. Purvis in connection with the multiple-count felony case commenced against him in 2009.

[*39] However, there is evidence in the record, and we have found, that Mrs. Purvis told Mr. Schmidt that Mr. Purvis solely owned the Dublin property as an agent for NCGMI and that NCGMI funds were used to purchase the property, which in turn led Mr. Schmidt to deduce that the gain resulting from the 2006 sale of the Dublin property should not be reported on petitioners' 2006 return. She also provided Mr. Schmidt with the necessary information so that petitioners could claim deductions for mortgage interest paid by NCGMI with respect to the Dublin property and the Shannon residence in 2005 and 2006 and cash contributions made to various charitable and religious organizations by NCGMI on their behalf. And yet conveniently, Mrs. Purvis refrained from disclosing that she received a monthly paycheck from NCGMI from April to September 2006 and that Mr. Purvis received payments from NCGMI during the years at issue, that they deposited cash from NCGMI's bank accounts into their personal bank accounts, and that NCGMI paid some of their personal expenses.

Additionally, Mr. Purvis' assertion during the ACC investigation, and more specifically during the subpoena enforcement action, that he did not have any documents or records relating to NCGMI is inconsistent with petitioners' assertion at trial (and on brief) that all NCGMI documents necessary to file accurate returns were seized during the ACC investigation. On the basis of the record before us we

[*40] find that petitioners' position changes as it becomes advantageous for them. Accordingly, we find that this factor favors a finding of fraud for the years at issue.

### 4. Concealing Income or Assets

Intent to evade tax may be inferred from the "concealment of assets or covering up sources of income". Spies v. United States, 317 U.S. 492, 499 (1943). A taxpayer's use of a business entity to cloak the personal nature of expenses evidences fraud. See Romer v. Commissioner, T.C. Memo. 2001-168, slip op. at 45-46; see also Evans v. Commissioner, slip op. at 12-14 (finding that payments received from a closely held or controlled business entity and used for a taxpayer's personal expenses are income to the taxpayer and the failure to report that income is evidence of fraud).

Petitioners concede that they failed to report income from NCGMI on their Federal income tax returns for the years at issue as well as a short-term capital gain from the 2006 sale of the Dublin property on their 2006 return. Despite these knowing failures they never made an attempt to prepare accurate amended returns for any of the years at issue.

Furthermore, there is evidence in the record, and we have found, that petitioners used NCGMI to pay some of their personal expenses; payments from

[*41] NCGMI for the benefit of petitioners included NCGMI's payment of their mortgages, car loans and insurance, and personal credit cards, and the purchase of jewelry for Mrs. Purvis and a downpayment on a new home that they sought to buy. The record also reflects, and we have found, that Mrs. Purvis became aware that NCGMI was paying some of petitioners' personal expenses sometime in 2006, before the filing of any of the returns for the years at issue. Since NCGMI did not issue Forms W-2 or Forms 1099 to petitioners, they were able to conceal the receipt of income. Accordingly, this factor favors a finding of fraud for the years at issue.

### 5. Dealing in Cash

Extensive dealing in cash to avoid scrutiny of a taxpayer's finances is a badge of fraud. See Bradford v. Commissioner, 796 F.2d at 307-308. In particular, when a taxpayer's dealings in cash are accompanied by attempts to conceal transactions or avoid cash transaction reporting requirements, that course of conduct is probative evidence of fraud. See Valbrun v. Commissioner, T.C. Memo. 2004-242, slip op. at 8-9.

There is evidence in the record, and we have found, that Mr. Purvis withdrew significant amounts of cash from NCGMI's bank accounts in 2005 and 2006. Petitioners contend that such withdrawals were not intended to be

**[\*42]** concealed because they would deposit the cash into their personal bank accounts. The personal bank account records of petitioners that are in evidence are those for 2007 and 2008. Thus, given that these records are in evidence, we do agree with petitioners that the fact that they dealt in cash in 2007 and 2008 (making significant deposits into and withdrawals from their personal bank accounts) was not an attempt to conceal. Accordingly, respondent has proven by clear and convincing evidence that the years for which petitioners' dealings in cash taken directly from NCGMI are indicative of fraud are only 2005 and 2006.

6. Information Provided to Tax Return Preparer

A taxpayer's failure to provide his or her tax return preparer complete and accurate records may reflect a taxpayer's intent to conceal and deceive. See Dubose v. Commissioner, T.C. Memo. 1996-99, slip op. at 8-9; Scallen v. Commissioner, T.C. Memo. 1987-412, aff'd, 877 F.2d 1364 (8th Cir. 1989). Furthermore, a taxpayer's failure to even orally disclose the information that he or she knows to his or her tax return preparer is evidence of fraudulent intent. Vanover v. Commissioner, T.C. Memo. 2012-79, slip op. at 14-15 (finding that the taxpayer's failure to inform his tax return preparer that he used his business bank accounts to pay personal expenses and to purchase luxury items was evidence of fraud).

[*43] Mrs. Purvis hired Mr. Schmidt to prepare petitioners' joint Federal income tax returns for the years at issue. The record shows, and we have found, that she discussed certain issues relating to NCGMI with him but failed to disclose that from April to September 2006 she received a monthly paycheck of $2,500 from NCGMI or that Mr. Purvis received payments from NCGMI, that they deposited cash from NCGMI's bank accounts into their personal bank accounts, and that NCGMI paid some of their personal expenses. Indeed, Mrs. Purvis assured Mr. Schmidt that he could use the 2004 return as a template for preparing the returns for the years at issue even though the 2004 return did not report any income from NCGMI and reported a Schedule C loss for a "consulting" business Mr. Purvis had. Moreover, she told Mr. Schmidt that all information needed to calculate Mr. Purvis' income for the years at issue was seized by the ACC when in fact the only documents seized were for 2005 and 2006. We find that petitioners provided Mr. Schmidt with incomplete and misleading information. Accordingly, this factor favors a finding of fraud for the years at issue.

7. Filing False Documents

"Fraudulent intent may be inferred when a taxpayer files a document intending to conceal, mislead, or prevent the collection of tax. Filing false documents with the IRS constitutes 'an "affirmative act" of misrepresentation

[*44] sufficient to justify the fraud penalty.'" <u>Durland v. Commissioner</u>, T.C. Memo. 2016-133, at *79 (citation omitted) (quoting <u>Zell v. Commissioner</u>, 763 F.2d 1139, 1146 (10th Cir. 1985), <u>aff'g</u> T.C. Memo. 1984-152). Petitioners filed Federal income tax returns for the years at issue, and for each year they knowingly omitted significant amounts of income from NCGMI. Accordingly, this factor favors a finding of fraud for the years at issue.

### 8. Failing To File Federal Income Tax Returns

While failing to file Federal income tax returns, even over an extended period, does not establish fraud per se, an extended pattern of failing to file tax returns may be persuasive evidence of fraud. <u>Hovind v. Commissioner</u>, T.C. Memo. 2012-281, at *55 (and cases cited threat). The untimely filing of tax returns also may be persuasive circumstantial evidence of fraud. <u>Id.</u> Petitioners did not file their Federal income tax returns for the years at issue until after they were contacted on multiple occasions by the IRS in 2008 and 2009 regarding their unfiled returns for 2005 and 2006. Petitioners did not timely file their returns for 2005, 2006, and 2007. Accordingly, this factor favors a finding of fraud for 2005, 2006, and 2007.

**[*45]**     9.     <u>Failing to Cooperate With Tax Authorities</u>

Failing to cooperate with IRS revenue agents during an audit is persuasive evidence of a taxpayer's fraudulent intent.  <u>Korecky v. Commissioner</u>, 781 F.2d 1566, 1568-1569 (11th Cir. 1986), <u>aff'g</u> T.C. Memo. 1985-63; <u>Prof'l Servs. v. Commissioner</u>, 79 T.C. 888, 932-933 (1982).

The record shows, and we have found, that although RA Garcia summoned NCGMI's and petitioners' personal bank account records, petitioners were largely cooperative during the audit of their returns for the years at issue; they spoke via telephone and corresponded with RA Garcia, Mrs. Purvis met with her in their residence, and they executed a Form 872 with respect to 2005 and 2006.  On balance, we find that this factor does not weigh in favor of a finding of fraud for the years at issue.

     10.     <u>Engaging in and Attempting To Conceal Illegal Activity</u>

The illegal nature of a taxpayer's activities and his or her concealment of those illegal activities are indicative of fraud.  <u>Niedringhaus v. Commissioner</u>, 99 T.C. at 211; <u>Wright v. Commissioner</u>, T.C. Memo. 2000-336, slip op. at 12.

The record shows, and we have found, that Mr. Purvis used NCGMI as a vehicle through which to pay some of petitioners' personal expenses.  Mrs. Purvis was aware of these payments starting sometime in 2006.  When the ACC

[*46] investigation commenced against NCGMI, Mr. Purvis, Mr. Wolfe, and other business associates of Mr. Purvis and Mr. Wolfe, Mr. Purvis went to great lengths to thwart it. Mr. Purvis failed to comply with subpoenas that the ACC issued to him, which prompted the subpoena enforcement action. Ultimately, he never produced any of the requested documents or records. He filed the July and August admiralty claims; these were frivolous and merely another attempt to disrupt the ACC investigation against him. Shortly after the securities action commenced against petitioners, Mr. Wolfe and his wife, NCGMI, ACI, and two other individuals, Mr. Purvis filed UCC financing statements against the same parties named in the July admiralty claim. He also filed an involuntary bankruptcy petition against the Arizona Republic journalist named in the July admiralty claim in an attempt to negate what the newspaper articles had reported about him. Ultimately, Mr. Purvis was found to be in violation of the Securities Act and was ordered to cease and desist from his actions, and petitioners were ordered to pay administrative fees totaling $250,000 and restitution of over $8 million.

Furthermore, while the securities action was pending, in 2007 Mr. Purvis was indicted on one count of bribery of a public servant and four counts of harassment of a public officer or employee. Ultimately, he was convicted by a jury on all counts in the indictment and was sentenced to concurrent terms of 1½

[*47] years' imprisonment for each of the harassment counts and 3 years' probation after discharge from prison and an $18,000 fine for the bribery count. He was also later indicted in 2009 on 1 count of fraudulent schemes and artifices, 1 count of illegal control of an enterprise, 21 counts of theft, 21 counts of securities fraud, 21 counts of sale of unregistered securities, and 21 counts of transactions by unregistered dealers or salesmen. Ultimately, he pleaded guilty to fraudulent schemes and artifices and illegal control of an enterprise and was sentenced to five years' imprisonment plus probation for seven years and ordered to pay restitution of not less than $3,818,923. As part of his plea agreement, the prosecutor's office agreed to not prosecute Mrs. Purvis for any role she may have had in the crimes charged in the indictment or file additional securities law violation charges, fraudulent schemes and artifices charges, money laundering charges, or criminal enterprise charges against her.

The record supports a finding that petitioners engaged in illegal activity during the years at issue and attempted to conceal that activity. Accordingly, this factor favors a finding of fraud for the years at issue.

C.    Conclusion

Numerous badges of fraud are present in this case. We conclude that respondent has proven by clear and convincing evidence that petitioners underpaid

**[\*48]** their tax liabilities for the years at issue and that some portion of the underpayments was due to fraud. Accordingly, we hold that petitioners are liable for the section 6663(a) fraud penalties for the years at issue.[16]

III.     Reasonable Cause

We now address petitioners' reasonable cause defense. Section 6664(c)(1) provides that "[n]o penalty shall be imposed under section \* \* \* 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." The determination of whether there is reasonable cause and the taxpayer acted in good faith depends upon the pertinent facts and circumstances of a particular case. Sec. 1.6664-4(b)(1), Income Tax Regs. We consider, among other factors, the experience, education, and sophistication of the taxpayer, the taxpayer's efforts to assess his or her proper tax liability, and the taxpayer's reliance on the advice of a professional. Id. Reasonable cause may exist where the taxpayer relies on professional advice if the taxpayer proves by a preponderance of the evidence that: (1) the adviser was a competent professional who had sufficient expertise to justify the taxpayer's reliance on him or her;

---

[16]On the basis of our holding, we need not address respondent's alternative position that petitioners are liable for accuracy-related penalties pursuant to sec. 6662(a).

[*49] (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Estate of Temple v. Commissioner, 67 T.C. 143, 162 (1976) ("While a taxpayer's reliance upon his accountant to prepare accurate returns may indicate an absence of fraudulent intent, * * * this is true in the first instance only if the accountant has been supplied with all the information necessary to prepare the returns.").

Petitioners contend that they qualify for the reasonable cause defense because they relied on Mr. Schmidt to prepare their returns for the years at issue. Their contention lacks merit. As we have already found, see supra pp. 42-43, petitioners failed to provide Mr. Schmidt with complete information and knowingly misled him about their income and deductions for the years at issue. We therefore find that petitioners did not rely on Mr. Schmidt's "judgment", nor did they act in good faith. Petitioners have failed to prove that they had reasonable cause within the meaning of section 6664(c). Accordingly, we sustain respondent's determination regarding the section 6663(a) fraud penalties.

**[*50]** We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.